O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| MGA ENTERTAINMENT, INC., et al.,<br><br>       **Plaintiffs,**<br><br>   vs.<br><br>THE HARTFORD INSURANCE GROUP, et al.,<br><br>       **Defendants.** | **Case No.: ED CV 08-0457-DOC(RNBx)**<br><br><br>**ORDER GRANTING (1) LEXINGTON'S MOTION FOR SUMMARY JUDGMENT (Dkt. No. 333), AND (2) GRANTING THE CHARTIS EXCESS INSURERS' MOTION FOR SUMMARY JUDGMENT (Dkt. No. 342)** |

Before the Court are two Motions for Summary Judgment, the first filed by Lexington Insurance Company ("Lexington") (Dkt. 333) and the second filed by National Union Fire Insurance Co. of Pittsburgh, PA ("National Union") and Chartis Specialty Insurance Co. ("Chartis") (collectively, the "Chartis Excess Insurers") (Dkt. 342). Together, Lexington and

the Chartis Excess Insurers are referred to as the Chartis Member Companies.[1]  After considering the papers for and against the Motions and oral argument, the Court GRANTS the Motions.

## I.    Background

This consolidated action arises from coverage disputes surrounding the defense of MGA Entertainment, Inc. ("MGA") in the underlying case *Carter Bryant v. Mattel, Inc*., Case No. 04-09049 (the "Mattel Action").  Because the parties are intimately familiar with the undisputed background facts of both the Mattel Action and this consolidated coverage action, they are repeated here only as necessary to support the Court's ruling.

In the Mattel Action, MGA tendered its defense to Crum & Forster on January 5, 2007.  Crum & Forster denied coverage on July 3, 2007.  After Mattel filed its SAAC, on October 22, 2007, MGA tendered its defense to The Hartford Insurance Group ("Hartford") and Evanston, both of which declined to defend.  In November 2007, MGA also tendered its defense to Lexington.  Lexington first declined to defend, but stated that it would "monitor" the claims.  Also in November 2007, MGA tendered its defense to National Union and Chartis.

On April 3, 2008, MGA sued Crum & Forster, Hartford, and Lexington.  On January 7, 2009, MGA sued Evanston.  These actions, alleging breach of the insurance agreements and breach of the implied covenant of good faith and fair dealing, were consolidated into the present action.  The first three actions were resolved ultimately by settlement; the action against Evanston remains unresolved.

---

[1] Although both motions were initially filed against primary insurers Crum & Forster Specialty Insurance Company ("Crum & Forster") and Evanston Insurance Company ("Evanston"), on January24, 2012, counsel for the Chartis Member Companies informed the Court that, pursuant to a settlement reached by the parties, the motions were withdrawn with respect to Crum & Forster only.  Formal notices of withdrawal were filed on February 14, 2012.  Accordingly, the Court's ruling applies to Evanston only.

In response to MGA's lawsuit, in May 2008, Lexington agreed to participate in MGA's defense pursuant to a reservation of rights.  Lexington agreed to reimburse MGA at the customary rates for similar work in the jurisdiction, citing California Civil Code § 2860.  After MGA began submitting invoices to Lexington, Lexington retained Jim Wagoner of McCormick, Barstow, Sheppard, Wayte & Carruth LLP ("McCormick") to review MGA's invoices.  Lexington stated that the review was to determine whether the invoices were objectively reasonable, and to apply the § 2860 rates.  Upon reviewing invoices, McCormick recommended certain payments, net of deductions, be made to MGA.  Those payments are discussed in further detail below.

In addition to Lexington, the Chartis Excess Insurers also agreed to participate in funding MGA's defense after Evanston, which had the primary scheduled coverage below the Chartis Excess Insurers, declined to defend.

After the Chartis Member Companies agreed to defend MGA, a dispute over billing rates arose.  After negotiations, the Chartis Member Companies entered into a confidential settlement agreement with MGA (the "Chartis-MGA Settlement Agreement") that resolved the billing rate disputes for fees incurred through September 30, 2008.  The Chartis-MGA Settlement Agreement set forth hourly rates and reimbursement limits which the Chartis Member Companies agreed to follow.  Following an independent review by McCormick, the parties also agreed on the total amount of fees and costs MGA would be paid from the date of tender through September 30, 2008.  The total amount paid pursuant to the Chartis-MGA Settlement Agreement is discussed in further detail below.  Pursuant to the Chartis-MGA Settlement Agreement, MGA also released the bad faith claim it brought against Lexington based on Lexington's initial failure to defend.

On June 24, 2009, Judge Larson entered an order finding that Crum & Forster and Evanston had an ongoing duty to defend MGA beginning at the time of tender.  That order explained that allegations in Mattel's SAAC triggered the duty to defend.  In November 2009, both Crum and Forster and Evanston began participating in MGA's defense on a going-forward basis.  Because only the Chartis Member Companies paid for MGA's defense from May 2008

until Judge Larson's order finding a duty to defend, they brought a contribution action against Evanston and Crum & Forster.  As part of that dispute, the Chartis Member Companies filed the present Motions for Summary Judgment seeking reimbursement from Crum & Forster and Evanston for the post-tender period in which the other primary insurers were not participating. As stated previously, due to a settlement, the Motions have been withdrawn with respect to Crum & Forster.

## II.     Legal Standard

Summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The court must view the facts and draw inferences in the manner most favorable to the non-moving party.  *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1992); *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1161 (9th Cir. 1992).  The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact for trial, but it need not disprove the other party's case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986).  When the non-moving party bears the burden of proving the claim or defense, the moving party can meet its burden by pointing out that the non-moving party has failed to present any genuine issue of material fact.  *Musick v. Burke*, 913 F.2d 1390, 1394 (9th Cir. 1990).

Once the moving party meets its burden, the opposing party must set out specific facts showing a genuine issue for trial; merely relying on allegations or denials in its own pleading is insufficient.  *See Anderson,* 477 U.S. at 248-49.  A party cannot create a genuine issue of material fact simply by making assertions in its legal papers.  *S.A. Empresa de Viacao Aerea Rio Grandense v. Walter Kidde & Co., Inc.*, 690 F.2d 1235, 1238 (9th Cir. 1982).  Rather, there must be specific, admissible evidence identifying the basis for the dispute.  *Id.*  The Supreme Court has held that "[t]he mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for [the opposing party]."  *Anderson*, 477 U.S. at 252.

//

### III.   Lexington's Motion

#### a.  Equitable Contribution

Under California law, "[a]n action for equitable contribution allows an insurer to sue for pro rata reimbursement from another insurance company when it has defended a mutually insured party without participation by the other insurance company." *Hudson Ins. Co. v. Colony Ins. Co.*, 624 F.3d 1264, 1267 (9th Cir. 2010) (citing *Monticello Ins. Co. v. Essex Ins. Co.*, 162 Cal. App. 4th 1376, 76 Cal. Rptr. 3d 848, 856 (2008)).  Equitable contribution is invoked where the party seeking contribution wishes to recover from a co-obligor, in other words, a party who shares in the same liability.  *Monticello*, 162 Cal. App. 4th at 1385. Specifically, "[i]n the insurance context, the right to contribution arises when several insurers are obligated to indemnify or defend the same loss or claim, and one insurer has paid more than its share of the loss or defended the action without any participation by the others." *Id.*  The purpose of this rule of equity is to accomplish substantial justice by equalizing the common burden shared by coinsurers, and to prevent one insurer from profiting at the expense of others." *Id.* at 1386 (quoting *Fireman's Fund Ins. Co. v. Maryland Casualty Co.*, 65 Cal. App. 4th 1279, 1293) (citations and footnote omitted).

"[I]n an action for equitable contribution by a settling insurer against a nonparticipating insurer, the settling insurer has met its burden of proof when it makes a prima facie showing of coverage under the nonparticipating insurer's policy—the same showing necessary to trigger the recalcitrant insurer's duty to defend—and [] the burden of proof then shifts to the nonparticipating insurer to prove the absence of actual coverage." *Safeco Ins. Co. of Am. v. Superior Court*, 140 Cal. App. 4th 874, 881, 44 Cal. Rptr. 3d 841, 846 (2006).

#### b.  Duty to Defend

Because Lexington was the only primary insurer to defend during the relevant time period, Lexington is entitled to contribution from Evanston for defense costs if it establishes a potential for coverage on behalf of MGA under Evanston's policies.  *See Monticello*, 162 Cal. App. 4th at 1386.  *See also Scottsdale Ins. Co. v. Century Sur. Co.*, 182 Cal. App. 4th 1023,

1035, 105 Cal. Rptr. 3d 896, 906 (2010) ("[A] single insurer who bears the entire defense burden  has paid more than its fair share of the defense costs.").

As previously discussed, on June 24, 2009, this Court already found that Evanston had a duty to defend MGA based on the allegations in the SAAC.  This ruling is a sufficient basis for finding that Lexington has met its burden to show the potential for coverage.  Indeed, this issue has already been resolved.  Evanston's opposition does not present any substantive challenges to the finding of a duty to defend (from the date of tender until Evanston started participating in MGA's defense) because the Court has already adjudicated this issue.  Accordingly, because the duty to defend has been established, the Court concludes that Lexington is entitled to contribution from Evanston.

### c.  Allocation of Settlement Agreement Payments

Evanston argues that Lexington may not seek contribution because the Chartis-MGA Settlement Agreement does not allocate the settlement amount between defense costs incurred in the Mattel Action and the release of MGA's bad faith claim.  Citing *Essex Ins. Co. v. Heck*, 186 Cal. App. 4th 1513, 1527-28 (2010), Evanston argues that where a settlement agreement does not apportion the settlement between payment of claims covered under the policy (*i.e.*, breach of contract), and other claims (*e.g.*, bad faith), the settling insurer may not seek contribution from other insurers.

In *Essex*, the California Court of Appeal found that an insurer seeking equitable subrogation from a physician waived its claim to recover $700,000 paid to an injured party as settlement of personal injury claims and two related actions for declaratory relief and bad faith.  The court based its holding on the fact that the settlement agreement did not identify the insured or the amount paid to settle the medical malpractice claims against the physician, and it did not apportion damages between economic and non-economic injuries.  The court reasoned that allowing the insurer to seek equitable subrogation from the physician would place the physician in a position of having to prove unprovable facts such as how much was paid to settle the medical malpractice claim.

In discussing the equitable subrogation claim, the *Essex* court noted that in order for the insurer to prevail, the insurer had to prove that it compensated the injured party for the same loss for which the physician was liable. *Id.* at 1523.  Turning to the elements of equitable subrogation, the court asked whether the insurer proved that its settlement payment included payment for personal injury damages of the injured party on behalf of the insured (the second element) and the amount it paid for these damages (sixth element). *Id.* The court looked to the insurer's settlement agreement with the injured party and found that it released not only the named insured, the insurer, and the insurer's attorneys, but another third party as well, and the release was for all claims arising from the incident, including claims asserted in the personal injury action, the declaratory relief action, and the bad faith action. *Id.* at 1524.  Based on the blanket language in the settlement agreement, the court could not tell whether the insurer was stepping into the shoes of the insured and what amount was paid to compensate each claim.

As an initial matter, the Court notes that *Essex* is an equitable subrogation case, not an equitable contribution case. [2] *See id.* at 1522 (sole cause of action for indemnity based on equitable subrogation).  In the insurance context, the doctrine of equitable subrogation "permits the paying insurer to be placed in the shoes of the insured and to pursue recovery from third parties responsible to the insured for the loss for which the insurer was liable and paid." *Id.* at 1522 (internal quotation marks omitted).

Lexington does not seek equitable subrogation from Evanston and the Court questions whether the analysis in *Essex*, which relies heavily on whether the insurer met the six elements of an equitable subrogation claim, may be imported to the present analysis of Lexington's

---

[2] Lexington also cites *Essex* in support of the argument that the Crum & Forster should not receive credit for the amount paid to MGA in settlement because the MGA-Crum & Forster Settlement Agreement does not specify what the lump sum payment was settling (*i.e.*, the amount paid for defense fees and costs is unknown).  Because Crum & Forster is no longer a party to Lexington's motions, the Court need not address this argument.

equitable contribution claim.[3]  *See Emerald Bay Cmty. Ass'n v. Golden Eagle Ins. Corp.*, 130 Cal. App. 4th 1078, 1092, 31 Cal. Rptr. 3d 43, 55 (2005) ("The right of equitable contribution is not based on any right of subrogation to the rights of the insured, and is not equivalent to standing in the shoes of the insured.") (internal quotation marks and alteration omitted).

The other case cited by Evanston, *United Auto. Ass'n v. Alaska Ins. Co.*, 94 Cal. App. 4th 638, 644-48 (2001), was also decided on equitable indemnity or equitable subrogation grounds.  It does not address equitable contribution.

While neither of these cases is on point, and the Court was unable to find an equitable contribution case with similar facts, the Court agrees with Lexington that in order to succeed on its equitable contribution claim, Lexington must prove that it paid more than its fair share of *defense and settlement costs* such that some of what it paid is allocable to Evanston.  *See Scottsdale Ins. Co. v. Century Surety Co.*, 182 Cal. App. 4th 1023, 1036 (2010).  In order for Lexington to meet its burden, it must be able to demonstrate the total amount it paid in defense and settlement costs, exclusive of any other payments made because they are irrelevant to this analysis.  For example, any amount Lexington paid to release non-contractual claims brought by MGA against Lexington (*e.g.*, bad faith) cannot be considered part of the total defense and settlement costs subject to contribution.

While the Chartis-MGA Settlement Agreement indeed releases MGA's initial bad faith claim against Lexington, the plain language of the settlement agreement demonstrates that the amounts paid correspond with defense fees and costs, and are thus allocable to Evanston based on Evanston's own concurrent obligation to defend MGA during this time period.  If it was MGA's and/or the Chartis Member Companies' intent to allocate a portion of the settlement funds to settlement of the bad faith claim, then the allocation could have been set forth explicitly in the settlement agreement, the same way payment of the defense fees and costs was explained

---

[3] The Chartis Excess Insurers do seek equitable subrogation from Evanston and that claim is discussed separately below.

in detail.  Instead, the Agreement releases the bad faith claim without allocation of any portion of the settlement amount.  *See Atlantic Mutual Ins. Co. v. J. Lamb, Inc.*, 100 Cal. App. 4th 1017, 1042-43, 123 Cal. Rptr. 2d 256, 275 (2002) (finding that the trial court properly resolved the issue of equitable contribution on summary judgment because if the insured intended to allocate some or all of the settlement amount to a bad faith claim against the insurance company, the insured should have caused such allocation to be explicitly set forth in the Settlement Agreement.)  "As it is presently worded, [the Chartis-MGA Settlement Agreement] supports, rather than precludes, [Lexington's] pursuit of equitable contribution against [Evanston]." *Id.* at 1043.

Specifically, the Chartis-MGA Settlement Agreement provides that:

> 7.     The Member Companies further agree that to date MGA and Larian are entitled to reimbursement for 16,141.52 partner hours, 5,375.00 counsel hours, 42,826.55 associate hours, 5,645.50 client specialist hours, 5,155.38 staff attorney hours, and 28,085.71 paralegal hours for work performed by independent counsel from the date of MGA's and/or Larian's initial tender, November 1, 2007, through September 30, 2008 (the "Agreed Hours").  The Agreed Hours when multiplied by the AIG Rates, results in an obligation to pay $25,144,808.20 (the "Settlement Fees"), less the Reimbursed Fees ($14,896,193.45) resulting in a net amount of $10,248,614.75 (the "Owed Fees").

> 8.     The Member Companies agree to pay to MGA and Larian the Owed Fees ($10,248,614.75) plus the Additional Costs ($1,375,259.71), less the Credited Amount ($401,790.57) for a total payment of $11,222,083.89 (the "Settlement Amount"). [4]

---

[4] Reimbursed Fees are the amount the Chartis Member companies already paid in MGA's defense as of the date of settlement, including $14,896,193.45 in attorneys' fees and $1,451,670.34 in costs incurred by independent counsel.  Reimbursed costs are $5,652,136.21 in costs incurred by outside vendors and other counsel.  The Reimbursed Fees and Reimbursed Costs together total $22,000,000.  The Credited Amount is derived from $401,790.57 the Member Companies paid MGA, which MGA was not entitled to and subsequently repaid.  The Additional Costs are $1,375,259.71 in invoices for vendor costs which were not yet paid at the time of settlement.  Parker Decl. [Under Seal] Ex. E at 3.

Parker Decl. [Under Seal] Ex. E at 6-7, ¶¶7-8.

This precise language details the agreed upon number of hours, hourly rates, and total agreed legal fees and costs to defend the Mattel Action for the relevant period. The detailed nature of this explanation supports the conclusion that the amount paid in settlement was to cover the defense fees and costs described in the Settlement Agreement. The Settlement Agreement does not describe any additional amounts paid to MGA to settle non-breach of insurance contract claims arising out of the billing dispute, including MGA's bad faith claim. Instead, after explaining the basis for the amount to be paid in settlement, the Agreement goes on to release claims relating to reimbursement, attorneys' fees, and bad faith, without any indication that the reimbursement of defense fees and costs should be partially allocated to these releases. While Evanston speculates as to why MGA did not allocate any sum to settlement of the bad faith claim, this speculation does not create a genuine issue of material fact in light of the plain language of the Agreement.

Similarly, although Evanston cites statements by MGA that the Chartis-MGA Settlement Agreement included payment for release of the bad faith claim, Khetan Decl., Exs. 3, 11, the nature of these statements is self-serving because MGA was trying to limit what offsets to defense costs Evanston could potentially seek. In other words, if MGA could limit possible offsets by a portion of the settlement that allegedly did not go toward reimbursement of defense fees and costs, in theory, Evanston would have to reimburse MGA for more fees and costs. This type of self-serving statement is insufficient to defeat summary judgment, especially when considered in light of the clear terms of the Chartis-MGA Settlement Agreement.

The reimbursement of defense fees and costs set forth in the Settlement Agreement is further supported by the McCormick invoice review and the resulting

recommended payments.   The below table summarizes the relevant invoice review periods and recommended/issued payments.  *See* Helsley Decl. [Under Seal], Exs. A-D.

| Review Period | Invoice Review | McCormick Letter | Payment Amount |
|---|---|---|---|
| 12/07-05/08 | <u>Fees</u><br>Skadden: $27,178,827.43<br>OMM: $158,364.00<br><br><u>Costs</u><br>Skadden: $1,105,040.36 | 06/25/08<br>Further information requested re fees.<br><br>$809,103.63 approved in costs. | **$1,000,000** recommended due to MGA's "dire financial situation," and because future payments would be necessary. |
| Same, plus second set of invoices received 07/08 | <u>Fees</u><br>Skadden: $27,179,027.66[5], plus review of new invoices | 07/17/08<br>Review ongoing.<br><br>$7,406,657.65 approved in fees. | **$10,000,000** recommended for same reasons as above. Overage to act as credit against future invoices. |
| Same invoices as above. | Same as above. | 08/11/08<br>Further information requested.<br><br>$6,193,437.76 approved in fees and costs. | **$9,000,000** recommended for same reasons as above. Overage to act as credit against future invoices. |
| Same invoices as above. | Same as above. | 09/30/08<br><br>$3,450,603.90 approved in fees and vendor invoices. | **No payment** recommended due to previous advance payments. |
| | | **Total Paid by Lexington:** | **$20,000,000** |

---

[5] This amount represents a correction to the amount stated in the June 25, 2008 McCormick letter.

Evanston argues that Lexington is attempting to "bootstrap" pre-settlement payments into the settlement so Lexington will look better vis-à-vis the other primary insurers.  This argument is illogical.  The whole purpose behind the Chartis-MGA Settlement Agreement was to settle billing disputes that arose from the time of tender until September 30, 2008.  Part of the dispute was over the hourly rates and number of hours approved and reimbursed by Lexington.  The Settlement Agreement required Lexington to pay more to MGA in accordance with the hours and rates agreed upon, and the fact that Lexington had already made certain payments before settlement does not support the inference that these payments had nothing to do with the disputes surrounding fees and costs resolved under the Settlement Agreement.

Lastly, the Court rejects Evanston's argument that Lexington has not addressed the concerns raised in the Court's November 3, 2010 order denying the Chartis Excess Insurers' earlier motion for summary judgment on their equitable indemnity claim.

In the November 3, 2010 order (Case No. CV 09-7461, Dkt. No. 67), the Court refused to issue an advisory opinion on whether the Chartis Excess Insurers were entitled to equitable indemnification from Evanston because the Chartis Excess Insurers provided the Court with no authority for the proposition that "the mere payment of funds by an excess insurer to a common insured gives rise to a claim for equitable indemnification against the primary insurer."  *Id.* at 7.  Even if such a claim existed, the Court noted it would at least need to determine whether the Chartis-MGA Settlement Agreement released any claims by MGA against the Chartis Excess Insurers arising out of the policies, and whether the Agreement allocated funds paid by the Chartis Excess Insurers to MGA.  *Id.*

While the Court questions the relevancy of its ruling on the Chartis Excess Insurers' equitable indemnity claim, to the extent that it is relevant to Lexington's equitable contribution motion for summary judgment, the Court notes that a copy of the Chartis-MGA Settlement Agreement has now been provided to both Evanston and the

Court.  Indeed, the Court discusses the release of claims and allocation of funds under the Chartis-MGA Settlement Agreement earlier in this order.

Evanston also quotes language from the November 3, 2010 order where the Court noted that the Chartis Excess Insurers did not attach any evidence of "the manner in which such sums [paid by the Excess Insurers to MGA] were used" and that Evanston required additional discovery of how MGA used the sums provided by the Chartis Excess Insurers  *Id.* at 6-7.

Although the Court noted the absence of this evidence, along with Evanston's desire to obtain discovery on this issue, the Court did not rule that such evidence was necessary to either the Chartis Excess Insurers' equitable indemnity claim, which was at issue in the November 10, 2010 order, or for any other purpose.  Indeed, Evanston has not cited nor has the Court found any legal authority suggesting that an equitable contribution claim against a non-participating insurer fails unless the participating insurer provides evidence of how the insured spent the defense sums it was paid by the participating insurer.  Such a rule would penalize a participating insurer for subsequent bad behavior of an insured, something that is out of the insurer's control.  At the same time, this rule would provide an escape hatch for a non-participating insurer if the participating insurer simply was unable to produce evidence of how the money was spent. The Chartis Member Companies are not MGA's accountants and the Court rejects Evanston's invitation to hold them responsible for producing evidence of MGA's subsequent actions.

### d.  Lexington's Motion is not Premature

Even if the Court finds that Lexington is entitled to equitable contribution, Evanston argues that Lexington's motion is premature because Lexington is seeking reimbursement of defense costs for the same period of time in which MGA seeks to recover against Evanston for breach of contract for failure to defend.  Evanston argues that if Lexington's motion is granted and MGA wins its breach of contract claim, Evanston will be subjected to making double payments for the relevant time period.

Lexington argues that under the Court's February 10, 2010 order, Evanston's argument is precluded because that order makes clear that Evanston is liable for the payment of "overage fees" for the relevant time period. While Lexington seeks contribution for the reimbursed defense fees and costs during the relevant time period, Lexington explains that MGA is seeking amounts in *excess* of those paid pursuant to the Chartis-MGA Settlement Agreement.

As the Court explained in its February 10, 2010 order (Dkt. No. 165), when an insurer declines to provide a defense, it may not later seek to impose the rate limitations set forth in California Civil Code § 2860. *See Atmel Corp. v. St. Paul Fire & Marine*, 426 F. Supp. 2d 1039, 1047-48 (N.D. Cal. 2005) (citing *Concept Enter., Inc. v. Hartford Ins. Co. of the Midwest*, No. CV 07-267-NM(JWJx), 2001 WL 34050685, at *3 (C.D. Cal. May 22, 2001)). In the February 10, 2010 order, the Court considered whether MGA could seek over $30 million in remaining unreimbursed defense fees and costs while Evanston was in breach of its duty to defend. (Dkt. Not. 165 at 13.) The Court concluded that it would be inequitable to allow an insurer who declines to defend to later refuse to pay rates in excess of the statutory limits imposed in § 2860. *Id.* at 16. Accordingly, the Court granted summary judgment to MGA on this issue and ordered "that Evanston is liable for the payment of 'overage' fees paid prior to its July 20, 2009 acceptance of the MGA Parties' defense." *Id.*

The Court finds that the February 10, 2010 ruling, when read in conjunction with the present order's construction of the Chartis-MGA Settlement Agreement, prevents MGA and Lexington from seeking double recovery against Evanston. It is undisputed that Lexington seeks reimbursement for a portion of the $20 million *already* paid in defense fees and costs to MGA during the relevant time period. While MGA's July 17, 2009 letter to Evanston may have posited that MGA's settlement agreements with the various other insurers acted to prevent Evanston from taking certain offsets, Khetan Decl. Ex. 3, in the same letter, MGA also recognizes that Evanston's failure to defend prevents Evanston from insulating itself from overage fees and costs incurred by counsel that might have otherwise been non-recoverable under § 2860 had Evanston agreed to defend.

The Chartis-MGA Settlement Agreement bound MGA to accept reimbursement of defense fees and costs incurred during the relevant time period from the Chartis Member Companies at agreed upon rates and hours, but the Agreement does not prevent MGA from seeking overage payments from Evanston, which refused to defend until finally being ordered to do so by the Court.  To the extent MGA seeks reimbursement for overage payments, MGA may substantiate those requests in its breach of contract action against Evanston by proving that it has not already been reimbursed for these amounts by any of the other insurers.  The separate and ongoing dispute between MGA and Evanston does not change the historical amount paid to MGA by the Chartis Member Companies, and nothing that occurs in MGA's breach of contract action against Evanston will change whether Evanston must equitably contribute to the Chartis Member Companies for amounts already paid to MGA.

Evanston also argues that this motion is premature based on the Court's recent award of $137 in attorneys' fees to MGA.  Evanston argues that before it should be required to reimburse Lexington for defense fees and costs, any offset Lexington receives from the attorneys' fee award should be factored in before figuring out Evanston's share of liability.

The Court declines Evanston's invitation to further delay ruling on the allocation of the historical defense fees incurred by MGA and reimbursed by Lexington.  MGA's award of attorneys' fees is currently on appeal.  There is no reason the issues before the Court cannot be resolved presently, and if and when the attorneys' fee award is upheld, all contributing insurers who believe they have a right to an offset may seek an appropriate reimbursement from MGA at that time.  Of course, any offset sought by Lexington would necessarily have to be reduced by the amount awarded today in contribution from Evanston.

## IV.  Allocation among Primary Insurers

In California, "[t]here is no single method of allocating defense or indemnity costs among co-insurers."  *Golden Eagle Ins. Co. v. Insurance Co. of the West*, 99 Cal. App. 4th 837, 854, 121 Cal. Rptr. 2d 682, 693 (2002).  Instead, trial courts "maintain equitable discretion to fashion a method of allocation suited to the particular facts of each case and the interest of justice[.]"  *Id.*

Under this flexible standard, courts have adopted several different allocation methods, including:

> "(1) apportionment based upon the relative duration of each primary policy as compared with the overall period of coverage during which the 'occurrences' 'occurred' (the 'time on the risk' method); (2) apportionment based upon the relative policy limits of each primary policy (the 'policy limits' method); (3) apportionment based upon both the relative durations and the relative policy limits of each primary policy, through multiplying the policies' respective durations by the amount of their respective limits so that insurers issuing primary policies with higher limits would bear a greater share of the liability per year than those issuing primary policies with lower limits (the 'combined policy limit time on the risk' method); (4) apportionment based upon the amount of premiums paid to each carrier (the 'premiums paid' method); (5) apportionment among [the] carrier[s] in equal shares up to the policy limits of the policy with the lowest limits, then among [the] carrier[s] other than the one issuing the policy with the lowest limits in equal shares up to the policy limits of the policy with the next-to-lowest limits, and so on in the same fashion until the entire loss has been apportioned in full (the 'maximum loss' method); and (6) apportionment among [the] carrier[s] in equal shares (the 'equal shares' method)."

*Id.* at 854-55 (quoting *Centennial Ins. Co. v. United States Fire Ins. Co.*, 88 Cal. App. 4th 105, 112-13, 105 Cal. Rptr. 2d 559 (2001) (internal citations omitted).

Lexington argues that the Court should apply a time on the risk allocation, finding each primary insurer responsible for a share of the defense costs based on how many policy years they insured MGA.

Evanston argues that the selected allocation method should take into account which insurer provided more coverage for the risk. Evanston argues that the allegations of disparagement in the SAAC occurred in 2006, which was during the Lexington policy period. Evanston also points to the fact that MGA was slow to sue Evanston for coverage, and the Chartis Excess Insurers themselves believed initially that Evanston was not under a duty to defend.

Because the liability in this coverage action hinges on the duty to defend, which is triggered where a *potential* for coverage exists under the relevant policy language, the Court finds that Evanston was under an equal and undivided duty to that of Lexington to defend MGA

against the entire Mattel Action.  As such, the Court agrees with Lexington that time on the risk is the appropriate and equitable allocation method for this case.  Apportioning defense costs based on the notion that one insurer was subject to more risk is disingenuous in the duty-to-defend context because the mere possibility of coverage under a policy is enough to trigger the full duty to defend the entire underlying action.  *See Buss v. Superior Court*, 16 Cal. 4th 35, 46 (1997).  To the extent Evanston is asking the Court to revisit its conclusion regarding duty to defend, or somehow find that one primary insurer had "less" of a duty to defend than another based on specific policy language, because the duty exists independently under both insurers' policies, the Court rejects this request.

The Court applies the time on the risk method of allocation based on the shares set forth in the following table.

| Primary Insurer[6] | Policy Periods | Share of Defense Costs for Relevant Time Period |
|---|---|---|
| Hartford | January 1, 1999 – January 1, 2001 | 2 years / 9 policy years |
| Evanston | January 1, 2001 – January 1, 2003 | 2 years / 9 policy years |
| Crum & Forster | January 1, 2003 – January 1, 2006 | 3 years / 9 policy years |
| Lexington | January 1, 2006 – January 1, 2008 | 2 years / 9 policy years |
| | Total: | 9 policy years |

Based on the foregoing allocation, the Court finds that Evanston should equitably contribute 2/9 of MGA's relevant defense fees and costs.  Upon conclusion of the Court's

---

[6] Because MGA has conceded if the primary insurers owe a duty to defend then the excess insurers owe no such duty, based on the Court's finding of duty to defend for all three primary insurers, the Court concludes (in its order granting Dkt. No. 323) that the Chartis Excess Insurers have no duty to defend.  Accordingly, no allocation as to those insurers is required here.  The later allocation of defense fees and costs between Lexington and Evanston takes into account this conclusion.

discussion of the second motion for summary judgment brought by the Chartis Excess Insurers, the Court calculates what amount Evanston is ordered to pay based on what Lexington and the Chartis Excess Insurers have each paid MGA.

### V.    Chartis Excess Insurers' Motion

The Chartis Excess Insurers seek reimbursement from Evanston for the amounts they paid to defend MGA before Evanston began participating in the defense.  Because they issued *excess* policies, they argue that they are not liable for any of the amounts they paid because MGA's primary insurance was not exhausted.  *See Olympic Ins. Co. v. Employers Surplus Lines Ins. Co.*, 126 Cal. App. 3d 593, 599 (1981) ("all primary insurance must be exhausted before liability attaches under a secondary policy.").

In response to the Chartis Excess Insurers' motion for summary judgment on the duty to defend (Dkt. No. 323), MGA concedes that if the primary insurers are found to owe a duty to defend that the Chartis Excess Carriers owe no such duty.  Because the Court has found in separate orders that Lexington, Evanston, and Crum & Forster all owed a duty to defend, the Court concluded in its order on Dkt. No. 323 that the Chartis Excess Insurers indeed had no duty to defend.  Accordingly, if the Chartis Excess Insurers can show they are entitled to equitable subrogation or equitable indemnity, a portion of what they paid may be allocated to Evanston.

### a.  Equitable Subrogation

"There are six elements essential to an insurer's cause of action based on equitable subrogation: '(1) [t]he insured has suffered a loss for which the party to be charged is liable, either because the latter is a wrongdoer whose act or omission caused the loss or because he is legally responsible to the insured for the loss caused by the wrongdoer; (2) the insurer, in whole or in part, has compensated the insured for the same loss for which the party to be charged is liable; (3) the insured has an existing, assignable cause of action against the party to be charged, which action the insured could have asserted for his own benefit had he not been compensated for his loss by the insurer; (4) the insurer has suffered damages caused by the act or omission upon which the liability of the party to be charged depends; (5) justice requires that the loss should be entirely shifted from the insurer to the party to be charged . . . ; and (6) the insurer's

damages are in a stated sum, usually the amount it has paid to its insured, assuming the payment was not voluntary and was reasonable.'" *Essex*, 186 Cal. App. 4th at 1522-23 (quoting *Fireman's Fund Ins. Co. v. Maryland Casualty Co.*, 21 Cal. App. 4th 1586, 1596, 26 Cal. Rptr. 2d 762 (1994)).

Evanston argues that the Chartis Excess Insurers are not entitled to summary judgment on their equitable subrogation claim because disputed issues of fact remain as to at least five of the foregoing elements.

### i.  Whether Payments were Voluntary

Evanston's first argument is that the Chartis Excess Insurers had no obligation to defend MGA because Lexington was already providing a complete defense and the Chatis Excess Insureres were merely excess insurers who *chose* to drop down without an obligation requiring them to do so.  Because they acted as volunteers, Evanston contends that they forfeited any rights to recover via equitable subrogation.

In response, the Chartis Excess Insurers first contend that California has all but abandoned the "volunteer" rule.  Next, even if the Court considers whether they were volunteers, the Chartis Excess Insurers explain that because the umbrella coverage in the excess policies provides *primary* coverage for claims not covered by the underlying primary insurance, they were obligated to defend MGA where Evanston's underlying policies did not provide coverage.  Thus, when it was believed that the Evanston polices did not cover claims alleged in the Mattel Action, the portion of the Chartis Excess Insurers' policies providing primary coverage kicked in to fill the gap in coverage.

Although the Chartis Excess insurers cite *Truck Ins. Exchange v. Unigard Ins. Co.*, 79 Cal. App. 4th 966, 984 (2000), as recognizing the "demise of the broad volunteer rule," the broad volunteer rule referred to in that case was in the *contribution* context.  The court explained that a volunteer rule in the contribution context would punish participating insurers for paying more than their fair share by unjustly enriching unknown or recalcitrant insurers.  *See also* 39A Cal. Jur. 3d Insurance Contracts § 610 (2008) (also discussing the inapplicability of the volunteer rule in the equitable contribution context).

As previously stated, a party seeking equitable subrogation must demonstrate that payment of the amount it seeks to recover "was not voluntary and was reasonable." *Essex*, 186 Cal. App. 4th at 1523.  However, the Court disagrees with Evanston that the Chartis Excess Insurers were acting as volunteers.  "A volunteer has been defined as 'a stranger or intermeddler who has no interest to protect and is under no legal or moral obligation to pay under the circumstances.'" *State Farm Fire & Casualty Co. v. Cooperative of Am. Physicians, Inc.*, 163 Cal. App. 3d 199, 203, 209 Cal. Rptr. 251, 253 (1984) (quoting *Smith v. Travelers Indemnity Co.*, 32 Cal. App. 3d 1010, 1018, 108 Cal. Rptr. 643 (1973)) (second internal quotation marks omitted).  The Chartis Excess Insurers believed initially that Evanston had no duty to defend, a position Evanston agreed with, and the excess insurers defended in Evanston's stead.  The fact that the Chartis Excess insurers "may have provided payment while unsure of [their] obligation does not bar recovery once [their] obligation has been determined." *Clarendon Am. Ins. Co. v. Mt. Hawley Ins. Co.*, 588 F. Supp. 2d 1101, 1106 (C.D. Cal. 2008).

Moreover, that Evanston's duty to defend was at issue until the Court's June 24, 2009 established Evanston's duty should not prevent the Chartis Excess Insurers from seeking subrogation from Evanston if it was reasonable for them to believe they had a legal obligation to defend MGA when they chose to do so.  *See Great Am. West, Inc. v. Safeco Ins. Co. of Am.*, 226 Cal. App. 3d 1145, 1149 n.4, 277 Cal. Rptr. 349 (1991) (noting, if not for statute of limitations issue, it would "be sufficient if Great American paid amounts for which Safeco was totally or jointly responsible in the reasonable belief it might also be responsible").

The Court finds that under Policy No. BE 7408285 (January 1, 2001 – January 1, 2002) (the "2001 Policy") the Chartis Excess Insurers reasonably concluded that they had a duty to defend the Mattel Action even where it turned out they were legally incorrect about Evanston's duty to defend.  *See* Parker Declaration (Dkt. No. 346), Ex. B.  Under the 2001 Policy, MGA received two forms of coverage: (1) Coverage A for "Excess Follow Form Insurance", and (2) Coverage B for "Umbrella Liability Insurance." *Id.* at 42 (numbered page 1 of policy).  "Umbrella insurance provides coverage for claims that are not covered by the underlying primary insurance." *Legacy Vulcan Corp. v. Superior Court of Los Angeles Cty.*, 185 Cal. App.

4th 677, 681 (2010).  The 2001 Policy's Umbrella Liability Insurance is relevant here because it provides that:

> We will pay on behalf of the Insured those sums in excess of the Self-Insured Retention that the Insured becomes legally obligated to pay as damages by reason of liability . . . because of Bodily Injury, Property Damage, Personal Injury or Advertising Injury **not covered by Scheduled Underlying Insurance**, provided that [the occurrence happens within the policy period]. . . . Coverage B will not apply to damages that would have been covered by Scheduled Underlying Insurance even if the total applicable limits of Scheduled Underlying Insurance have been exhausted by payment of the loss.

*Id.* at 42 (emphasis added).

Under the 2001 Policy, the General Liability Scheduled Underlying Insurance was provided by Evanston, Policy No. 00GLP1005176.  *Id.* at 63.  When MGA tendered to Evanston, Evanston maintained, and in fact still maintains, that it was under no obligation to defend against the Mattel Action.  Because the Chartis Excess Insurers concluded, as Evanston did, that Evanston's underlying 2001 policy did not cover the injury alleged in the Mattel Action, it was reasonable for them to conclude they owed MGA a duty to defend based on Coverage B.  Therefore, the Court finds that the Chartis Excess Insurers' reimbursement of defense costs to MGA was not voluntary and was reasonable.[7]  *Id.* at 41.

### ii.  Assignable Cause of Action

Evanston argues that a disputed issue of fact exists regarding whether MGA has an assignable cause of action against Evanston which MGA could have asserted had the Chartis

---

[7] Because the Court finds that it was not voluntary and was reasonable for the Chartis Excess Insurers to reimburse defense costs under the 2001 Policy, the Court need not decide whether reimbursement under Commercial Umbrella Policy No. BE 7413666 (January 1, 2002 – January 1, 2003) (the "2002 Policy") was also not voluntary and was reasonable.  *See* Parker Decl. Ex. A at 7 (containing different policy language taking into account whether coverage existed under "*any other underlying insurance*") (emphasis added).

Excess Insurers not provided a defense.  Evanston speculates that had the excess insurers not defended, Lexington would have provided a complete defense and the excess insurers would not be entitled to any assigned claim.  Evanston also maintains that MGA is pursuing its claim against Evanston for the same time period, preventing the excess insurers from taking assignment of the claim.

Evanston's speculation of whether or not Lexington would have continued to provide a full defense in the absence of the excess insurers' participation does not negate the fact that if MGA had not been compensated for its defense costs, it would have had a claim against all insurers who breached their duty to defend, including Evanston.  Indeed, MGA sued to enforce its rights under the relevant policies.  While MGA's recovery against Evanston is now limited according to proof that MGA has not already been compensated for the same defense fees and costs, as explained above, this does not mean that MGA would have had no recourse had it not been reimbursed.  *See RLI Ins. Co. v. CNA Cas. of California*, 141 Cal. App. 4th 75, 45 Cal. Rptr. 3d 667 (2006) ("When a primary insurer refuses to defend, its insured is entitled to make the best possible settlement [with a defending excess insurer], and has an assignable claim against the primary insurer for bad faith and for dereliction of its contractual duty to defend.")

### iii.  Damages Caused by Failure to Defend

Evanston argues that whether the Chartis Excess Insurers suffered damages due to Evanston's failure to defend MGA is disputed.  Evanston claims that the Chartis Excess Insurers suffered damages because they volunteered to drop down.  Evanston reasons that the excess insurers should not have chosen to "split some of their sister company's loss."

The Court has already rejected Evanston's "volunteer" argument.  The Court finds that the Chartis Excess Insurers have suffered damages in the form of paying defense fees and costs to MGA as a result of Evanston's failure to defend.  If Evanston had recognized its duty to defend before the Court's June 24, 2009 order, it would have been unnecessary for the excess insurers to defend under umbrella Coverage B.

To the extent Evanston argues that some of the Chartis Excess Insurers' "damages" took the form of payment for the excess insurers' bad faith liability, the Court's earlier discussion of the Chartis-MGA Settlement Agreement forecloses this argument.

### iv.  What Justice Requires

Evanston argues that justice does not require the $18.9 million paid by the Chartis Excess Insurers to be shifted to Evanston.  Evanston cites *Fireman's Fund Ins. Co. v. Sonitrol Mgmt. Corp.*, 298 Fed. Appx. 668, 669 (9th Cir. Nov. 5, 2008), for the proposition that the inquiry into "equitable superiority" should examine whether one party caused the loss or was in the best position to prevent the loss.  Evanston repeats its earlier arguments that it did not cause the loss and that the excess insurers had no legal obligation to drop down.

For the reasons explained above, the Court finds that (1) it was reasonable for the Chartis Excess Insurers to conclude they had a legal obligation to defend, and (2) Evanston caused the Chartis Excess Insurers' loss.  Moreover, Evanston was in the best position to prevent the loss because it simply could have defended from the date of MGA's tender instead of waiting for the Court's order.  Evanston's complaints about the manner in which the Chartis Member Companies shared in what each party believed was its complete and undivided duty to defend ring hollow where Evanston has made every effort in this case to ignore its own duty to defend.  Evanston is not in the equitably superior position and the Court finds that justice requires that Evanston reimburse its share of the Chartis Excess Insurers' damages.

### v.  Liquidated Sum

Evanston again argues that it is unclear what amount, if any, paid by the Chartis Excess Insurers represent MGA's defense fees and costs.  This argument is foreclosed by the Court's earlier discussion of the Chartis-MGA Settlement Agreement.  *See*, *supra*, Section III.C.

With respect to the Chartis Excess Insurers, the McCormick invoice review confirms that the following amounts were paid for defense fees and costs.  *See* Helsley Decl. [Under Seal], Exs. E-M.  *See also* UF #58-88.

| Date of McCormick Letter | Recommended Payment | Payment Amount |
|---|---|---|
| 12/02/08 | $1,343,893.36 | (see next line) |
| 12/03/08 | $951,537.66 | $2,000,000[8] |
| 02/05/09 | $879,324.79 | $879,324.65 |
| 03/16/09 | $318,374.79 | $318,374.79 |
| 03/16/09 | $272,900.17 | $272,900.17 |
| 04/29/09 | $478,941.18 | $478,941.18 |
| 05/29/09 | $575,121.19 | $575,121.19 |
| 06/23/09 | $189,416.57 | $189,416.57 |
| 08/03/09 | $2,280,389.88 | $2,280,389.88 |
| 09/04/09 | $318,124.22 | $318,124.22 |
| 10/07/09 | $371,352.72 | $371,352.72 |
| Settlement Amount | N/A | $11,222,083.89 |
| **Total Amount Paid by Chartis Excess Carriers:** | | $18,906,029 |

The Court concludes that the liquidated sum paid by the Chartis Exess Insurers was $18,906,029.

### vi.  Equitable Subrogation Conclusion

None of the arguments raised by MGA demonstrate that a disputed issue of fact remains regarding the Chartis Excess Insurers' equitable subrogation claim.  In the absence of disputed facts, the Court may resolve this issue as a matter of law.  Accordingly, the Court grants the Chartis Excess Insurers' motion for summary judgment on their equitable subrogation claim. The appropriate remedy is discussed below.

### b.  Equitable Indemnity

---

[8] The amounts McCormick recommended for payment on December 2 and December 3, 2008 were covered by two $1million dollar checks issued by the Chartis Excess Carriers on November 25, 2008.  *See* Marrero Decl., Ex. A at 6; Ex. B at 18.

Evanston argues that as a matter of law, the Chartis Excess Insurers may not bring a claim for equitable indemnity.  Although the Court noted previously an apparent split in authority on this issue, *see* Case No. 09-7461 Dkt. No. 67, the Court need not revisit the issue at this time.  Instead, because the Court grants the Chartis Excess Insurers' motion for summary judgment on equitable subrogation, the Court finds that the claim for equitable indemnity is moot.  The Chartis Excess Insurers can be made whole by subrogation and the Court need not analyze whether hypothetically they could also succeed under an equitable indemnity theory.

## VI.    Remedy

As explained in the time on the risk discussion, the Court finds that Evanston is responsible for 2/9 of MGA's relevant defense fees and costs.  Based on the fact that both Lexington and the Chartis Excess Insurers have made certain payments to MGA, and that the Chartis Excess Insurers owed no duty to defend, the Court finds that the appropriate remedy is to aggregate all of those payments and apportion the total owed by Evanston according to the 2/9 ratio.[9]

Although the Court has concluded that the Chartis Excess Insurers were under no duty to defend, because the Court has found that all of the primary insurers did owe a duty to defend, it would be unfair to allocate all of the Chartis Excess Insurers' defense fees and costs to Evanston.  Instead, Evanston is only responsible for 2/9 of the *total* defense fees and costs paid by Lexington and the Chartis Excess Insurers.  The Chartis Excess Insurers have chosen to pursue equitable subrogation from Evanston only, and that is the sole dispute on which the Court rules with respect to the excess insurers' payments of $18.9 million to MGA.  If the excess carriers wished to seek recovery of proportionate shares of their defense fees and costs from Lexington and Crum & Forster, they could have done so.  However, their motion was

_____

[9] As stated previously, the Court's ruling regarding the appropriate allocation does not apply to Crum and Forster because Lexington and Crum and Forster have already reached a settlement agreement on this issue.

withdrawn as to Crum & Forster and the Court recognizes that a subrogation claim against Lexington would have been pointless because they are sister companies.

Based on the McCormick invoice reviews and corresponding payments summarized elsewhere in this order, the Court calculates the relevant total defense fees and costs as follows:

| Insurer | Total Amount Paid | Evanston's 2/9 Share |
|---|---|---|
| Lexington | $20,000,000 | $ 4,444,444.44 |
| Chartis Excess Insurers (Less Amount Reimbursed)[10] | $18,906,029 -($689,477) $18,216,552 | $ 4,048,122.66 |

In conclusion the Court orders Evanston to pay the Chartis Member Companies a total of **$ 8,492,567.10.** This amount represents 2/9 of the total relevant defense fees and costs paid by the moving parties. Lexington is owed **$ 4,444,444.44** and the Chartis Excess Insuers are owed **$ 4,048,122.66**.

**VII.   Pre-Judgment Interest**

The Court finds that Lexington and the Chartis Excess Insurers are entitled to prejudgment interest at a rate of 10 percent per annum. *See* Cal. Civ. Code § 3287(a) ("Every person who is entitled to recover damages certain, or *capable of being made certain by calculation*, and the right to recover which is vested in him upon a particular day, is entitled also to recover interest thereon from that day[.]") (emphasis added); *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Am. and Foreign Ins. Co.*, No. CV 04-7257 PA (PLAx), 2006 WL 4757339, at *6 (C.D. Cal. Feb. 9, 2006) (citing Cal. Civil Code § 3287(a); *Cornia v. Wilcox*, 898 P.2d 1379, 1387 (Utah 1995)).

---

[10] *See* Khetan Decl., Ex. 12 (representing Evanston's reimbursement of half of the 4/7 share the Chartis Member Companies had paid for defense fees and costs incurred after the Court's June 24, 2008 order finding a duty to defend). This amount must be excluded so the Chartis Excess Insurers aren't reimbursed-in-part twice for the same defense fees and costs.

**VIII.  Disposition**

For the reasons stated above, the Court GRANTS Lexington's Motion for Summary Judgment and GRANTS the Chartis Excess Insurers' Motion for Summary Judgment.  Evanston is ordered to pay (1) Lexington $ 4,444,444.44, plus prejudgment interest, and (2) the Chartis Excess Insuers $ 4,048,122.66, plus prejudgment interest.

DATED:  February 24, 2012

_David O. Carter_____

DAVID O. CARTER
UNITED STATES DISTRICT JUDGE