O

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# SOUTHERN DIVISION

| | |
|---|---|
| MGA ENTERTAINMENT, INC., et al. | Case No.: SACV 08-0457 DOC(RNBx) |
| **Plaintiffs,** | Consolidated with:  CV 10-7692-DOC(RNBx), CV 10-355- DOC(RNBx),  CV 09-7461-DOC(RNBx) |
| **vs.** | |
| THE HARTFORD INSURANCE GROUP, et al., | **ORDER RULING ON MOTIONS:** |
| **Defendants.** | 1) **GRANTING IN PART AND DENYING IN PART EVANSTON DEFENDANTS' MOTION FOR RELIEF FROM JUDGMENT [Dkt. 636]** |
| | 2) **DENYING EVANSTON DEFENDANTS' MOTION FOR LEAVE TO AMEND ANSWER AND COUNTERCLAIMS [Dkt. 633]** |
| | 3) **GRANTING LEXINGTON DEFENDANTS' MOTION FOR RELIEF FROM JUDGMENT [Dkt. 590]** |

Before the Court are three motions.  The Court: (1) GRANTS IN PART and DENIES IN PART the Evanston Defendants' Motion for Relief from Judgment (Dkt. 636); (2) DENIES the Evanston Defendants' Motion of Leave to File Amended Answer and Cross-Claims (Dkt. 633); and (3) GRANTS the Lexington Defendants' Motion to Clarify and Amend Order (Dkt. 590) filed by National Union Fire Insurance Company ("National"), Chartis Specialty Insurance

Company ("Chartis") (collectively, "Umbrella Insurers"), and Lexington Insurance Company ("Lexington").  Because the parties are familiar with the facts of the case, the Court does not recount them here.

## I.     The Court Will Reconsider Its Prior Order Given that All Parties Are Unhappy With It

The Evanston Defendants, Lexington, and the Umbrella Insurers have moved for relief from judgment of the Court's prior order ("Prior Order") (Dkt. 521), although on different grounds.

### a.  The Parties Have Failed State the Correct Legal Standard By Which Their Motions Should Be Evaluated

As an initial matter, the Court notes that not a single opening brief by any movant in any of these motions provided the correct legal standard under which to evaluate whether the movant was entitled to relief.  *See* Evanston Defs. Mem. in Opp'n and Cross-Motion for Relief From J. (Dkt. 637) at 1:7 (blithely referencing "Rule 60(b) and 59(e)" but failing to mention *any* case law regarding these rules and entirely ignoring Local Rule 7-18); Lexington Defs. Mem. in Support of Mot. for Relief From J. (Dkt. 590) at 1:9 (same); Evanston Defs. Mem. in Support of Mot. for Leave to File Amended Answer and Counterclaims (Dkt 634) at 5-7 (curiously devoting pages to Federal Rule of Civil Procedure 15, despite the fact that Rule 16 applies).

While the Court is happy to reconsider its prior rulings, the Court is not inclined to consider any more motions that fail to provide the correct legal standard.  In this case the Court has already had to contend with one motion to reconsider – disguised as a mere correction of a typo – that failed to state the correct legal standard.  *See MGA Entm't v. Hartford Ins. Group*, EDCV 08-0457-DOC, 2012 WL 528313 at *1, 2012 U.S. Dist. LEXIS 20459 at *1 (C.D. Cal. Feb. 16, 2012) (analyzing motion titled "Request for Correction" as a motion for reconsideration and amendment of the Court's prior order).  In addition, the Court has been subjected to multiple summary judgment motions in which the Evanston Defendants failed to mention the controlling substantive state law.  *See MGA Entm't, Inc. v. Hartford Ins. Group*, 2012 U.S. Dist. LEXIS

24000 (C.D. Cal. Feb. 24, 2012) (denying summary judgment because movants "neither cite nor discuss the controlling law").

As it appears inevitable that the parties will continue to file motions in this case, they are highly encouraged to: (1) include a section in their briefs entitled "Legal Standard" which accurately describes the Federal Rule of Civil Procedure under which they are moving and, if relevant, the accompanying Local Rule; and (2) explain in the body of their brief *how* the facts or substantive law satisfy that legal standard.[1]

### b.  Nonetheless, the Court Will Reconsider Its Prior Order

Federal Rule of Civil Procedure 60(b)(6) provides for relief from judgment based on "any other reason that justifies relief."  Fed. R. Civ. P. 60(b)(6); *Phelps v. Alameida*, 569 F.3d 1120, 1131 n.12 (9th Cir. 2009).  Here, the reason justifying relief is that *both* the movant and non-movant insurers involved in the motion resolved by the Prior Order now seek reconsideration, and *all* the other parties in this case – the other insurer as well as the mutual insured – have joined in at least one of these motions.  While the definition of a compromise may be that every party is equally unhappy, the Court reconsiders its Prior Order due to an abundance of caution that its decision was not just a compromise, but also bad law.

Thus, the Court GRANTS all parties' Motions for Relief from Judgment to the extent they ask the Court to reconsider its Prior Order (Dkt. 521).  *See MGA Entm't, Inc. v. Hartford Ins. Group*, ED CV 08-0457-DOC, 2012 WL 628203, 2012 U.S. Dist. LEXIS 23998 (C.D. Cal. Feb. 24, 2012).  However, in reconsidering its Prior Order, the Court concludes that not all the parties are entitled to the *specific* changes in the Prior Order that they seek.  Section II of this order addresses the parties' arguments regarding the specific changes to the Prior Order.

---

[1] The Court appreciates that Lexington and the Umbrella Insurers provided a legal standard and well-written argument in their Reply to their Motion.  *See* Lexington Defs. Reply (Dkt. 651) at 3-4.  However, the Court is baffled as to why these parties waited until the *Reply* to explain the basis of their motion.

Section III addresses the Evanston Defendants' separate motion for leave to amend their answer and cross-claims.

## II.     The Court Makes Several Changes to the Prior Order

For the reasons stated below, the Court changes its Prior Order (Dkt. 521) to: (1) add an explanation as to why the pie is $38.9 million and not larger; (2) decrease the denominator from 9 to 7; (3) reduce the amounts Lexington and the Umbrella Insurers overpaid by the amounts they received in settlement with C & F; (4) add an explanation as to why the Evanston Defendants' have an equitable subrogration liability to Chartis; (6) increase the amount the Evanston Defendants owe Chartis and National; and (6) reduce the prejudgment interest on the Evanston Defendants' equitable subrogation liability from 10 to 7 percent.

### a.  The Court's Prior Order

The Court's Prior Order (Dkt. 521) granted summary judgment to Lexington and the Umbrella Insurers on their respective equitable contribution and equitable subrogation claims against the Evanston Defendants.

Equitable contribution is a cause of action to "apportion a loss between two or more insurers who cover the same risk . . . so that each pays its fair share and one does not profit at the expense of the others." *Fireman's Fund Ins. Co. v. Maryland Cas. Co.*, 65 Cal. App. 4th 1279, 1296, 77 Cal. Rptr. 2d 296, 306 (1998); *Monticello Ins. Co. v. Essex Ins. Co.*, 162 Cal. App. 4th 1376, 76 Cal. Rptr. 3d 848, 856 (2008).  Under California law, "[t]here is no single method of allocating defense or indemnity costs among co-insurers." *Golden Eagle Ins. Co. v. Insurance Co. of the West*, 99 Cal. App. 4th 837, 854, 121 Cal. Rptr. 2d 682, 693 (2002).  The Court adopted the commonly-used "time on the risk" method, which provides for "apportionment based upon the relative duration of each primary policy as compared with the overall period of coverage during which the 'occurrences' 'occurred.'"  *See id.*

Under the "time on the risk" method, courts determine a specific insurer's "fair share" by calculating: (1) a **denominator**, which is the total number of insurance policies that created a duty to defend the insured in the underlying action; (2) a **numerator**, which is the total number of insurance policies that created a duty to defend *and* are owned by the specific insurer whose

share the Court is calculating; (3) a **fair share fraction**, which is the numerator divided by the denominator; and (4) the **pie**, which is the total amount of defense fees the insured incurred in the underlying action for which the insurers owed a duty to defend.  The specific insurer's "**fair share**" is the **fair share fraction multiplied by** the **pie**.

Regarding Lexington's equitable contribution claim, the Court calculated Lexington and Evanston's respective fair shares by calculating:

(1) a **denominator of 9**, which is the total of two Hartford Policies (calendar years 1999 and 2000), two Lexington policies (calendar years 2001 and 2002), three C & F policies (calendar years 2003, 2004, 2005), and two Evanston policies (2006, 2007) [9 = 2 Hartford + 2 Lexington + 3 C & F + 2 Evanston.].  *See* Order (Dkt. 521) at 17.

(2) a **numerator of 2 for Lexington**, reflecting the two Lexington policies that the court had previously held created a duty to defend, and **2 for Evanston**, reflecting the two Evanston policies that the court had previously held created a duty to defend.  *See id.*

(3) a **fair share fraction of 2/9 for Lexington**, and **2/9 for Evanston**.  *See id.*

(4) a **pie** of $38,906,029, which is the total amount of defense fees that Lexington and the Umbrella Insurers paid the insured **as of October 7, 2009,** in the underlying action for which Lexington and Evanston owed a duty to defend.  *See id.* at 26.

The Order calculated Evanston's "**fair share**" for purposes of equitable contribution as **$8,645,784**, which is the **2/9 fair share fraction** multiplied by the **$38,906,029 pie**.  The Order then divided this fair share between Lexington and the Umbrella Insurers.  *See id.*

### b.  The Parties' Motions for Relief From Judgment

The parties seek the following specific changes to the Court's Prior Order (Dkt. 521).  Lexington and the Umbrella Insurers, joined by another insurer Crum & Forster ("C & F") and their mutual insured, MGA Entertainment ("MGA"), argue that this Court should change the denominator from 9 to 7.  The Evanston Defendants argue that this Court should: (1) increase the pie to roughly $155 million, which is the total that *all* insurers – primary insurers (Evanston, Lexington, C & F and non-party Hartford) and the Umbrella Insurers – have paid MGA as of the Evanston Defendants' recent settlement with MGA; (2) retain the denominator of 9; (3) reduce

the amounts Lexington and the Umbrella Insurers overpaid by the amounts they received in
settlement with C & F; (4) eliminate the Evanston Defendants' liability to Chartis; and (5)
reduce the prejudgment interest from 10 to 7 percent.

### c. The Pie Is Only $38.9 Million Because that Sum Reflects the Total Fees Paid By Party Insurers Before Evanston Agreed to A Denominator of 7, Not Including Overages

The Court rejects the Evanston Defendants' argument that the pie should be increased
from $38.9 to $155 million.  However, the Court will add an explanation to the Prior Order as to
why the pie is $38.9 million and not larger.  Accordingly, the Court DENIES the Evanston
Defendants' Motion for Relief from Judgment to the extent it seeks to increase the pie and
ADDS the following to the Prior Order's (Dkt. 521):

In its Prior Order, the Court allocated Lexington and Evanston's respective fair shares of
a "pie" of $38,906,029.  Although the Evanston Defendants did not dispute this pie in their
previous briefing, they now argue that the pie should be increased to include all the payments to
the insured by all insurers in this action, including payments to MGA by Evanston due to a
recent settlement and by a non-party insurer, Hartford.  The Court rejects the Evanston
Defendants argument because a legally-significant event occurred in November 2009 that merits
treating the insured's defense fees as two "pies": Evanston's agreement to allocate *future*
payments to MGA among the other insures using a denominator of 7.  Evanston's November
2009 agreement created at least two "pies": (1) a pie comprised of $38,906,029, which is the
total amount of payments to MGA by Lexington and the Umbrella Insurers prior to the Evanston
Defendants' November 2009 agreement, not including "overages"[2]; and (2) a pie comprised of
other fees incurred by MGA that are subject to Evanston's November 2009 agreement.

---

[2] "Overage" is the term the Court used in its prior order to refer to defense fees and costs
incurred by the insured, MGA, that exceed the hourly rate limit imposed by California Civil
Code § 2860(c).  *See* February 10, 2010, Order (Dkt. 165) at 12:7-8.  This Court previously
granted MGA summary judgment against Evanston on the issue of whether Evanston was liable

Where insurers have "agreed among themselves on the method of allocation" of an insured's defense costs, those insurers are "bound by [their] choices." *Scottsdale Ins. Co. v. Century Sur. Co.*, 182 Cal. App. 4th 1023, 1037, 105 Cal. Rptr. 3d 896, 907 (2010) (rejecting insurer's argument "that it can agree to one method of allocation with every other insurer on the risk, but obtain a different method of allocation . . . when seeking equitable contribution"); *see also* 64 A.L.R. 213 ("Although, of course, co-obligors cannot, by any agreement among themselves, affect their liability to the common creditor, they may regulate their rights and liability as among themselves; and in determining the rate or proportion of contribution, their contract fixing the same will be followed."). A formal contract is not necessary to show an insurer's agreement to allocate the defense costs; rather, an insurer is bound by even a handwritten scrawl on an attorney's bill. *See Scottsdale*, 182 Cal. App. 4th at 1034, 1034 n.27 (holding that insurer in equitable contribution case was "bound by" its prior statements regarding the fraction it paid of certain defense costs, including "a handwritten notation on a bill stating 'Ok to pay . . . 1/2 share'").

The undisputed evidence submitted by both parties for the motion resolved by the Prior Order shows that the Evanston Defendants agreed to a denominator of 7 in November 2009. The Lexington Defendants submitted an affidavit stating that "on or around November 2009, Evanston . . . began to contribute 2/7ths of MGA's defense costs invoiced to its insurers . . . ." Schmidt Decl. (Dkt. 335) at ¶ 9. In addition, the Lexington Defendants submitted evidence that, "as of October 7, 2009, the Evanston Defendants had not yet begun to participate in MGA's defense."[3] Evanston Defs. Statement of Genuine Issues Regarding National and Chartis

---

for overages, holding that the "hourly rate limitation of California Civil Code § 2860(c) is not applicable to fees incurred when Evanston was in breach of its duty to defend." *Id.* at 11-16, 20.

[3] Although the Evanston Defendants' Statement of Genuine Issues states that they "[d]ispute[] that Evanston had not yet begun to participate in MGA's defense," this bald assertion is not supported by any documentation. Because the Evanston Defendants have not provided evidence contradicting this fact, the dispute is not genuine and does not preclude summary judgment.

(Sealed Dkt. 423) at 26. Finally, the Evanston Defendants do not dispute that "[a]fter the Court held that [Crum & Forster and Evanston] had a duty to defend" – a decision which was issued on June 24, 2009 – "Crum & Forster and Evanston agreed to contribute 3/7 and 2/7 shares of MGA's defense costs going forward."  Evanston Defs. Statement of Genuine Issues Regarding Lexington (Sealed Dkt. 403) at 36; Evanston Defs. Statement of Genuine Issues Regarding National and Chartis (Sealed Dkt. 423) at 35.

The Evanston Defendants' Motion for Relief from Judgment does not mention their November 2009 agreement and instead argues that the Prior Opinion's holding that Evanston and Lexington had "an equal and undivided duty" to defend their mutual insured, MGA, requires the Court to adopt the Evanston Defendants' proposed pie.  Evanston  Defs. Mem. in Opp'n and Cross-Motion (Dkt. 637) at 4-5.  In *Centennial Insurance v. US Fire Insurance*, the court expressly rejected the same argument by a defendant insurer in an equitable contribution action.  *Centennial Ins. Co. v. United States Fire Ins. Co.*, 88 Cal. App. 4th 105, 114, 105 Cal. Rptr. 2d 559, 564 (2001).   The defendant insurer argued that its method for calculating each insurer's fair share was best "because each of the insurers in this case owed their mutual insured . . . a 'complete duty to defend' the entire claim."  *Id.*  The court rejected the argument because it "confuses the rules applicable to equitable contribution *among insurers* with those pertinent to the relationship between an insurance carrier *and its own insured.*"  *Id.* at 114-15.  The court explained that an insurer's duty to defend its insured is "governed by the contract of insurance between [those] parties," whereas an insurer's right to equitable contribution from other insurers is based in equitable principles, not contract.  *Id.* at 115.  This Court follows the excellent logic of *Centennial* and rejects the Evanston Defendants' argument that the Court is bound to adopt their method of allocation for this equitable contribution action simply because this Court has found that the insurers involved in this action each owed a duty to defend.

Thus, Evanston's November 2009 agreement to adhere to a denominator of 7 for future fees created *at least* two "pies": (1) a pie comprised of $38,906,029, which is the total amount paid to MGA by Lexington and the Umbrella Insurers prior to the Evanston Defendants' November 2009 agreement, not including "overages"; and (2) a pie comprised of other fees

incurred by MGA that are subject to Evanston's November 2009 agreement.[4]  The Court's Prior
Order addressed only the $38.9 million pie because that was the only sum on which any party
moved.  The Court appropriately refrained from conflating the $38.9 million pie and the other
pie because the analysis would be different; whereas the Evanston Defendants were free to argue
any denominator regarding the $38.9 million pie, they were bound by their agreement to a
denominator of 7 for the other pie.

Because the Court concludes that there are *at least* two pies, the Court does not address
the parties' other arguments regarding whether the Evanston Defendants' recent settlement with
MGA included overages and whether Evanston is solely liable for these overage fees.  *See*
Lexington Defs. Opp'n (Dkt. 652) at 6-8.  These sums belong to a *different* pie than the
$38,906,029 pie which is the subject of the present litigation.

### d.  The Court Reduces the Denominator From 9 to 7 to Prevent an Inequitable Result, Namely, the Evanston Defendants Benefitting From Their Failure to Implead the Non-Party Insurer Hartford

The Court changes the denominator in its Prior Order from 9 to 7 to prevent an
inequitable result, namely, the Evanston Defendants benefitting from their failure to implead the
non-party insurer Hartford.  Accordingly, the Court GRANTS the Lexington Defendants'
Motion for Relief from Judgment.  The Court VACATES the Prior Order's (Dkt. 521) holding
that the denominator in this equitable contribution action is 9, located on pages 17:13-18:3, and
replaces it with the following:

---

[4] The Court refers to only two pies here for the sake of simplicity.  However, the Court agrees
with C & F's statements at oral argument that there are actually 3 "pies": (1) a pie of
$38,906,029, which is the total amount of defense fees that Lexington and the Umbrella Insurers
paid the insured as of October 7, 2009, in the underlying action prior to the Evanston
Defendants' November 2009 agreement; (2) a pie comprised of an indeterminate amount of
"overages"; and (3) a pie comprise of the remaining defense fees and costs which fall into
neither of the first two categories.

### i. The Non-Evanston Insurers' New Argument Avoids the Logical Inconsistencies of Its Previous Arguments

In the earlier motion resolved by the Prior Order, the Evanston Defendants argued that the denominator should include two insurance policies of a non-party insurer, Hartford.  The Evanston Defendants contended that the logic of the Court's prior holding – that Evanston's policies created a duty to defend – compels the same conclusion regarding *similar* language in Hartford's two insurance policies.  *See* Evanston Defs. Opp'n to Summary J. (Dkt. 399) at 21:15-22:11; Evanston  Defs. Opp'n and Cross Motion (Dkt. 637) at 4:1-4, 10-11 (explaining that the reasoning required to hold that the Hartford policies do not create a duty to defend is contrary to the "June 24, 2009 ruling that there was a duty o defend based on the non-time-specific disparagement allegations in the SAAC."); *see also* Order (Dkt. 480) (denying Evanston Defendants' motion on the duty to defend); Order (Dkt. 510) (granting summary judgment to Evanston Defendants' insured on the duty to defend issue).

In response, Lexington and the Umbrella Insurers simply argued that the Hartford's two policies did not create a duty to defend, relying on interpretations of the policies' language that this Court had previously rejected in interpreting similar language in Evanston's policies.  The Court rejected Lexington and the Umbrella Insurers' argument because it required this Court to adopt a logical inconsistency: interpreting contract language to create a duty to defend for one insurer, but not for another insurer.  Thus, although the Evanston Defendants cited no authority for their position, the Court adopted the Evanston Defendants' denominator of 9 to avoid the logical inconsistency created by the other insurer's arguments for a denominator of 7.

However, the Court is now confronted by a new, more persuasive argument.  Aside from Evanston, every insurer party to this action, as well as their mutual insured, now contend that this Court should exclude the two Hartford policies from the denominator to prevent an inequitable result, namely, the Evanston Defendants benefitting from their failure to implead the non-party insurer Hartford.  *See* Lexington Defs. Mot. (Dkt. 590) at 2-3.  As these parties note, the Evanston Defendants could have impleaded Hartford under Federal Rule of Civil Procedure 14, but chose not to do so throughout the duration of this case.  *See Travelers Prop. Cas. Co. of*

*Am. v. Liberty Surplus Ins. Corp.*, CV08-4066 CAS(OPX), 2009 WL 1044625 at *1-3 (C.D. Cal. Apr. 17, 2009) (granting defendant insurer's motion under Rule 14(a) to implead another insurer in an action brought by plaintiff insurer for equitable contribution and subrogation); 2 Law and Prac. of Ins. Coverage Litig. § 15:1014 (noting that in an "equitable contribution" cases, Rule 14 is a "means by which an insurer defending a policyholder's coverage action can effect the joinder of other insurers to share in the loss."); A Cyc. of Federal Proc. § 72:2 (3rd ed.) (Noting that in an "equitable contribution" case a co-insurer "may be impleaded even though the party will not be liable to the defendant until judgment has been rendered against the defendant."); Rutter Cal. Prac. Guide Fed. Civ. Pro. Before Trial Ch. 7-F ("Impleader [under Rule 14] is most commonly used for claims against a third party for . . . subrogation . . . or contribution among joint tortfeasors.").

> **ii.    On An Issue of First Impression, the Court Holds that A Defendant Insurer In An Equitable Contribution Action that  Failed to Implead Other Insurers May Not Reduce Its Fair Share Fraction By Arguing On Summary Judgment that the Fraction's Denominator Should Include the Non-Party Insurers**

Thus, this case presents an issue of first impression: if a defendant insurer in an equitable contribution action fails to implead another insurer, may the defendant insurer reduce its fair share fraction on summary judgment by arguing that the fraction's denominator should include that non-party insurer?  The Court answers this question in the negative.[5]

In reaching this conclusion, the Court is guided by the general principle that equitable contribution is a cause of action to "apportion a loss between two or more insurers who cover

---

[5] Neither the parties nor this Court's research have revealed any authority on this issue.  In addition, at least one court has recently noted the lack of authority dealing with a similar situation: "an equitable contribution case in which the amounts paid by all participating insurers were *not* before the court."  *Scottsdale Ins. Co. v. Century Sur. Co.*, 182 Cal. App. 4th 1023, 1035, 105 Cal. Rptr. 3d 896, 905 (2010).

the same risk . . . so that each pays its fair share and one does not profit at the expense of the others." *Fireman's Fund Ins. Co. v. Maryland Cas. Co.*, 65 Cal. App. 4th 1279, 1296, 77 Cal. Rptr. 2d 296, 306 (1998).  An insurer's right to equitable contribution "is not a matter of contract, but flows 'from equitable principles designed to accomplish ultimate justice in the bearing of a specific burden." *Id.* 1294-95.

In considering the equities, the Court notes that the Evanston Defendants' failure to implead Hartford inures entirely to the benefit of the primary insurer that refused to defend its insured until after this Court ordered it to do so – Evanston – while potentially preventing the first primary insurer to defend – Lexington – from ever obtaining complete relief.  While the Court's inclusion of the two Hartford policies in the denominator is a *de facto* determination that those policies created a duty to defend, such a determination does not bind Hartford because Hartford is not a party to this action.  *See Owens v. Kaiser Found. Health Plan, Inc.*, 244 F.3d 708, 713 (9th Cir. 2001) (explaining that the doctrine of *res judicata*, also referred to as claim preclusion, bars any claims in a later case that could have been raised in a prior case only if the prior case involved the same parties or parties in privity).  Because Hartford is not bound by the Court's *de facto* conclusion, Lexington might never be able to recover from Hartford even if Lexington brought a separate lawsuit against Hartford.  If Lexington can not recover from Hartford, Lexington will not be made whole, while Evanston will have evaded paying its fair share.

Furthermore, at least one California court has rejected the allocation method proposed by an insurer where the insurer did not take "steps to involve the other insurers in this equitable contribution action" and where the insurer "stood to benefit financially in their absence." *Scottsdale Ins. Co. v. Century Sur. Co.*, 182 Cal. App. 4th 1023, 1035, 105 Cal. Rptr. 3d 896, 905 (2010).  Here, like in *Scottsdale*, the Evanston Defendants could have impleaded other insurers at any time, but "stood to gain if the other insurers were not present, and stood to lose if they were." *See id.*   Thus, like in *Scottsdale*, the Evanston Defendants are precluded from raising their denominator argument now, given that an equitable contribution action requires the

Court to balance the equities and that allowing an insurer to benefit from its failure to implead other insurers is inequitable.

In sum, the Court adopts the following rule: in an equitable contribution action, a defendant insurer that failed to implead other insurers may not reduce its fair share fraction on summary judgment by arguing that the fraction's denominator should include the non-party insurers.  Accordingly, the Court GRANTS the Lexington Defendants' Motion for Relief from Judgment and VACATES the Prior Order's holding that the denominator in this equitable contribution action is 9.  Instead, the Court holds that the denominator is 7, reflecting the 7 policies belonging to primary insurers who are parties to this case (Evanston, Lexington, and C & F) and which the Court has already held created a duty to defend.

### e.   The Amounts that the Lexington and the Umbrella Insurers Overpaid Are Reduced By the Amounts They Received From C & F in Settlement

"An insurer can recover equitable contribution only when that insurer has paid more than its fair share."  *Scottsdale Ins. Co. v. Century Sur. Co.*, 182 Cal. App. 4th 1023, 1036, 105 Cal. Rptr. 3d 896, 906 (2010).  If the plaintiff insurer "has not paid more than its fair share, it cannot recover, even against an insurer who has paid nothing."  *Id.*

In determining the amount that Lexington and the Umbrella Insurers overpaid, the Prior Order did not take into account the payments they received from C & F in settlement.  The Court agrees with the Evanston Defendants that this was error, although not for the reasons the Evanston Defendants provide.  *See* Evanston  Defs. Opp'n and Cross Motion (Dkt. 637) at 2. While the Lexington and Umbrella Insurers argue that these payments were "irrelevant," they cite no authority for this proposition and *Scottsdale* would appear to indicate otherwise.  *See* Lexington Defs. Opp'n (Dkt. 652) at 9.

### f.   Putting It All Together: Lexington and Evanston's New Fair Share Calculations

As noted previously, under the "time on the risk" method, courts determine a specific insurer's "fair share" by calculating: (1) a **denominator**, which is the total number of insurance policies that created a duty to defend the insured in the underlying action; (2) a **numerator**,

which is the total number of insurance policies that created a duty to defend *and* are owned by the specific insurer whose share the Court is calculating; (3) a **fair share fraction**, which is the numerator divided by the denominator; and (4) the **pie**, which is the total amount of defense fees the insured incurred in the underlying action for which the insurers owed a duty to defend.  The specific insurer's "**fair share**" is the **fair share fraction multiplied by** the **pie**.

### i. Lexington and Evanston's Fair Shares Are Each $11,116,008

Regarding Lexington's equitable contribution claim, the Court recalculates Lexington and Evanston's respective fair shares as follows:

(1) a **denominator of 7**, which is the total of two Lexington policies (calendar years 2001 and 2002), three C & F policies (calendar years 2003, 2004, 2005), and two Evanston policies (2006, 2007) [7 = 2 Lexington + 3 C & F + 2 Evanston.].

(2) a **numerator of 2 for Lexington**, reflecting the two Lexington policies that the court had previously held created a duty to defend, and **2 for Evanston**, reflecting the two Evanston policies that the court had previously held created a duty to defend.

(3) a **fair share fraction of 2/7 for Lexington**, and **2/7 for Evanston**.

(4) a **pie** of $38,906,029.

The fair share is the fair share fraction multiplied by the pie.  Thus, **Lexington's fair share is $11,116,008** and **Evanston fair share is $11,116,008**.  [$11,116,008 = $38,906,029 * 2/7].

### ii. Lexington Overpaid $1,492,267

The amount Lexington overpaid is: (1) the amount Lexington paid into the pie; (2) minus reimbursements Lexington received from other insurers for the fees that Lexington paid into the pie; and (3) minus Lexington's fair share.  Here, Lexington paid into the pie $20 million. Lexington received $7,391,725.50 in reimbursement from C & F.  *See* Khetan Decl. Ex. 3 (Sealed Dkt. 638) at 5 (January 2012 settlement between Lexington and C & F).  Lexington's revised fair share is $11,116,008.

Thus, the amount that **Lexington overpaid is $1,492,267**.  [$1,492,267 = $20,000,000 – $7,391,725.50 – 11,116,008].

### iii.  Evanston Shall Reimburse Lexington for the $1,492,267 that Lexington Overpaid

Because the Evanston Defendants have not paid any of its fair share ($11,116,008) of the $38.9 million pie, Lexington is entitled to reimbursement from the Evanston Defendants for the amount that Lexington overpaid ($1,492,267).

Accordingly, the Court ORDERS Evanston to reimburse Lexington for the $1,492,267 that Lexington overpaid.

### g.  The Evanston Defendants' Have An Equitable Subrogation Liability to Chartis Because It Was Not A Volunteer

The Evanston Defendants correctly note that the Court's prior Order (Dkt. 521) is logically inconsistent because it explicitly refrains from addressing one of the Evanston Defendants' arguments against Chartis's equitable subrogation claim, but nonetheless requires the Evanston Defendants to pay Chartis for this claim.  *See* Evanston  Defs. Opp'n and Cross Motion (Dkt. 637) at 2, 7.  While the Court greatly appreciates the Evanston Defendants bringing this logical inconsistency to the Court's attention, the remedy the Evanston Defendants seek is improper.  Rather than simply eliminate the Evanston Defendants' liability to Chartis – the remedy desired by the Evanston Defendants – the Court will address the Evanston Defendants' argument on the merits.

The Court holds that Chartis did not act as a volunteer when it defended its insured, MGA and thus Chartis is not precluded from recovering under a theory of equitable subrogation. Accordingly, the Court VACATES the prior Order (Dkt. 521) regarding the text on pages 20:21-21:17 and replaces it with the following.

### i.  Categories and Subcategories of Insurance

#### 1.  There Are Two Categories of Insurance: Primary versus Secondary

Insurance policies are often grouped into two categories based on the terms of their policies: (1) "primary"; and (2) "secondary," which is often confusingly referred to as "excess."[6] "Primary" insurance "provides coverage immediately upon the occurrence of . . . an *event giving rise to liability*," such as an allegation in a complaint against the primary insurer's insured.  *See Legacy Vulcan Corp. v. Superior Court*, 185 Cal. App. 4th 677, 689, 110 Cal. Rptr. 3d 795, 803 (2010).  In contrast, "secondary" insurance provides coverage *in relation to* the coverage provided by *another insurer.  See id.*; *compare* Rutter Cal. Prac. Guide Ins. Lit. Ch. 8-C § 8:176 ("Primary insurance . . . provides immediate coverage upon the 'occurrence' of a 'loss' or the 'happening' of an 'event' giving rise to liability.") *with id.* at § 8:177 ("Excess insurance . . . provides coverage after other identified insurance is no longer on the risk.").

Here, it is undisputed that Evanston, Lexington, and C & F are MGA's primary insurers.[7]

### 2.  Two Subcategories of Secondary Insurance: Umbrella versus Excess

There are several *subcategories* of secondary insurance, the two relevant ones being: (1) "excess"; and (2) "umbrella."  *See Powerine Oil Co., Inc. v. Superior Court*, 37 Cal. 4th 377, 398 (2005).  "[U]mbrella" secondary insurance "cover[s] occurrences that are *not covered by* underlying policies of insurance."  *Id.* at 398 n.9 (2005) (emphasis added).  In contrast, "excess" secondary insurance "attaches upon the exhaustion of underlying insurance coverage for a claim."  *Id.* at 398 n.8; *see also Legacy Vulcan Corp. v. Superior Court*, 185 Cal. App. 4th 677, 689, 110 Cal. Rptr. 3d 795, 803 (2010) (comparing primary, excess, and umbrella insurance and

---

[6] *See, e.g., Century Indem. Co. v. London Underwriters*, 12 Cal. App. 4th 1701, 1707 n.5, 16 Cal. Rptr. 2d 393, 397 n.5 (1993) (noting parties confusion of the terms "excess" and "umbrella" when in fact the latter is a subcategory of the former).

[7] The Court previously granted summary judgment to MGA and held that these three primary insurers – Evanston, Lexington, and C & F – owed a duty to defend their mutual insured, MGA, because the allegations in the underlying litigation (the SAAC and FAAC) created at least a potential for coverage under each of the primary insurers' policies.

explaining that "excess insurance provides coverage only upon the exhaustion of specified primary insurance," whereas "[u]mbrella insurance provides coverage for claims that are not covered by the underlying primary insurance"); Rights and Responsibilities of Excess Insurers, 78 Denv. U. L. Rev. 29, 31 (2000) ("By essentially dropping down to provide primary coverage or by filling a gap in primary coverage, an umbrella policy broadens the insured's primary coverage where an excess policy does not.").[8]

### 3.   The Umbrella Insurers Defended Their Insured Based on Their Belief that the Umbrella Coverage Was Triggered

The Umbrella Insurers argue that they defended their insured, MGA, based on the umbrella provision in their respective policies.  Specifically, National relied on the provision in its 2001 Policy under the heading "Umbrella Policy" that states National "will pay . . . those sums . . . the Insured becomes legally obligated to pay as damages . . . because of . . . Personal Injury or Advertising Injury *not covered by Scheduled Underlying Insurance . . . .*"  *See* Parker Decl. Ex. B (Dkt. 346) at 42 (National's 2001 Policy language) (emphasis added); *id.* at Ex. C 104-05 (National letter to MGA explaining basis for insurer's acceptance of defense).  The 2001 Policy lists Evanston as an insurer under the heading "Schedule of Underlying Insurance."  Se*e id.* at Ex. B at 63 (identifying the Evanston policy by the following three lines: "EVANSTON INSURANCE CO."; "00GLP1005176"; and "01/01101 01101102").

Similarly, Chartis relied on the provision in its 2002 Policy under the heading "Commercial Umbrella Policy Form" that states Chartis "ha[s] the right and duty to defend any

---

[8] The categories "primary" versus "secondary" and "excess" versus "umbella" are simply shorthand used to classify the types of language in various insurance policies.  The Court uses this shorthand to explain the errors in the Evanston Defendants' argument that the Umbrella Insurers were volunteers, but keeps in mind that a Court must "look to the specific language of the [secondary insurer's] policy to ascertain the existence of a duty to defend."  *Ticor Title Ins. Co. v. Employers Ins. of Wausau*, 40 Cal. App. 4th 1699, 1707, 48 Cal. Rptr. 2d 368, 373 (1995).

claim or suit seeking damages . . . sought for . . . Personal Injury or Advertising injury covered by this policy but *not covered by* any underlying insurance *listed* in the Schedule of Underlying Insurance *or any other underlying insurance* providing coverage to the Insured." Parker Decl. Ex. A (Dkt. 346) at 7 (Chartis' 2002 Policy language) (emphasis added); *id.* at Ex. D 131-32 (Chartis letter to MGA explaining basis for insurer's acceptance of defense).

These provisions in the National 2001 and Chartis 2002 Policies each created "umbrella" secondary insurance coverage because each phrase committed its respective insurer to "cover occurrences that are *not covered by* underlying policies of insurance." *See Powerine Oil Co., Inc. v. Superior Court*, 37 Cal. 4th 377, 398 n.9 (2005) (defining "umbrella" secondary insurer).

> **ii.   A Secondary Insurer's Payment to Its Insured Is Not Voluntary for Purposes of Equitable Subrogation Where the Primary Insurer Disputed that It Owed A Duty to Defend and, If the Primary Insurer Was Correct, the Secondary Insurer's Duty Would Be Triggered**

An insurer is a "volunteer" if it has "no interest to protect" by paying its insured. *See State Farm Fire & Casualty Co. v. Cooperative of Am. Physicians, Inc.*, 163 Cal. App. 3d 199, 203, 209 Cal. Rptr. 251, 253 (1984). However, an insurer's interest need not be an *actual* legal obligation to its insured. *Home Ins. Co. v. Zurich Ins. Co.*, 96 Cal. App. 4th 17, 27, 116 Cal. Rptr. 2d 583, 591 (2002) ("[A]n insurer who pays a claim for which it is not legally responsible may be entitled to equitable subrogation.").

The exact definition of an "interest to protect" is not entirely clear from California courts' decisions, perhaps because equitable subrogation requires courts to engage in the inexact science of balancing equities. After reviewing several authorities, however, this Court concludes that a secondary insurer's interest includes even its reasonable *but incorrect* belief that it *might* owe a duty to defend.[9] Such a reasonable belief exists where: (1) the primary insurer disputes that it

---

[9] *See Fireman's Fund Ins. Co. v. Maryland Cas. Co.*, 21 Cal. App. 4th 1586, 1601 n.12, 26 Cal. Rptr. 2d 762, 771 n.12 (1994) (noting that an insurer is not a volunteer for purposes of equitable

owes a duty to defend; and (2) if the primary insurer is correct that it owes no duty to defend, the secondary insurer would owe a duty to defend their mutual insured.  *See Chicago Title Ins. Co. v. AMZ Ins. Services, Inc.*, 188 Cal. App. 4th 401, 432, 115 Cal. Rptr. 3d 707, 733 (2010) (holding that party was not a volunteer for purposes of equitable subrogation where, at the time the payment was made, the defendant insurer disputed that it was liable to the insured and, if the defendant insurer were correct, the plaintiff would be liable to the insured).

Here, as the Umbrella Insurers argue, the Umbrella Insurers acted not as volunteers but rather to protect an interest because they had a reasonable belief that they *might* owe a duty to defend MGA.  *See* Umbrella Insurers Reply (Sealed Dkt. 441) at 4-8; Lexington Defs. Opp'n to Cross-Motion (Dkt. 652) at 10.  Their belief was reasonable because: (1) the Evanston Defendants disputed that it owed a duty to defend; and (2) if the Evanston Defendants were correct that it owed no duty to defend, the Umbrella Insurers would owe a duty to defend MGA. Here, the first prong is satisfied because Evanston twice disputed that it owed a duty to defend.

The second prong is satisfied because the Umbrella Insurers' policies created a duty to defend MGA for claims "not covered by" the Evanston Policy.  The National 2001 Policy required National to defend claims "not covered by Scheduled Underlying Insurance," and defined such insurance as the Evanston 2001 Policy.[10]  Similarly, the Chartis 2002 Policy

---

subrogation where it "pays on the good faith, reasonable belief it might be liable" to the insured, even if the insurer maintains that a court will ultimately conclude the insurer has no liability); *Pines of La Jolla Homeowners Assn. v. Indus. Indem.*, 5 Cal. App. 4th 714, 726, 7 Cal. Rptr. 2d 53, 60 (1992) ("Where an insurer settles in good faith prior to a judicial determination of coverage, such insurer is not a mere volunteer and is entitled to pursue recovery [via] subrogation . . . of amounts it paid which were in fact covered by the non-settling insurer.") *disapproved on other grounds by Montrose Chem. Corp. v. Admiral Ins. Co.*, 10 Cal. 4th 645, 684-85 (1995).

[10] *See* Parker Decl. Ex. B (Dkt. 346) at 42 ("[National] will pay . . . those sums . . . the Insured becomes legally obligated to pay as damages . . . because of . . . Personal Injury or Advertising

created a "duty to defend any claim . . . not covered by . . . any other underlying insurance providing coverage to the Insured."  Because the term "any other underlying insurance" is not defined, California contract interpretation rules "resolve that ambiguity in favor of the objectively reasonable expectations of the insured."  *Legacy Vulcan Corp. v. Superior Court*, 185 Cal. App. 4th 677, 691, 110 Cal. Rptr. 3d 795, 805 (2010) (interpreting undefined phrase "any other underlying insurance" in umbrella policy).  Given that Evanston was undisputedly MGA's GLC primary insurer in 2002, MGA's reasonable expectations would have been that this term meant Evanston's 2002 policy.[11]  Thus, if Evanston were correct that it did not owe a duty to defend, the Umbrella Insurers would owe a duty to defend.

---

Injury not covered by Scheduled Underlying Insurance . . . ."); *id.* at 63 (listing "EVANSTON INSURANCE CO." and "00GLP1005176" and "01/01101 01101102" under the heading "Schedule of Underlying Insurance").

[11] *See* Parker Decl. Ex. A (Dkt. 346) at 7 ("[Chartis] ha[s] the right and duty to defend any claim or suit seeking damages . . . sought for . . . Personal Injury or Advertising injury covered by this policy but *not covered by* any underlying *insurance listed* in the Schedule of Underlying Insurance *or any other underlying insurance* providing coverage to the Insured.").  Curiously, unlike the National 2001 Policy, the Chartis 2002 Policy does not appear to define the phrase "any underlying insurance listed in the Schedule of Underlying Insurance."  *Compare* Parker Decl. Ex. A (Dkt. 346) at 24 (Chartis' 2002 Policy that does not name a specific insurer under the heading "GENERAL LIABILITY" in its "Schedule of Underlying Insurance.") *with id.* at Ex. B at 63 (National 2001 Policy identifying Evanston as an insurer under the heading "Schedule of Underlying Insurance").  However, the Court need not determine the meaning of the undefined phrase in the Chartis 2002 Policy because it concludes that Chartis reasonably believed it had an interest to protect based on the other phrase "any other underlying insurance providing coverage to the Insured."  *See id.* at Ex. A (Dkt. 346) at 7 (Chartis' 2002 Policy language).

The present case is like *Chicago Title Insurance Co. v. AMZ Insurance Services, Inc.*, in which the court held that a plaintiff "acted not as a volunteer, but to protect [an] interest" – and thus was not precluded from seeking equitable subrogation – because, "at the time" the plaintiff paid the insured, there was "a dispute whether [defendant insurers] or [plaintiff] was responsible for covering [insured's] loss." *Chicago Title Ins. Co. v. AMZ Ins. Services, Inc.*, 188 Cal. App. 4th 401, 433, 115 Cal. Rptr. 3d 707, 733-34 (2010). The insured sought compensation from both the plaintiff and the defendant insurer. *Id.* The defendant insurers "asserted, and continue[d] to assert, [that] they ha[d] no liability" under their insurance policy. *Id.* The court reasoned that the dispute and plaintiff's "potential liability created the necessary interest for [plaintiff] to protect." *Id.* Because the plaintiff had an interest to protect, it did not act as a volunteer by paying the insured. *Id.*

Here, like in *Chicago Title*, the Umbrella Insurers were protecting an interest by paying their insured because the Evanston Defendants disputed whether they or the Umbrella Insurers owed a duty to defend their mutual insured. Like in *Chicago Title*, the insured, MGA, sought compensation from both the Umbrella Insurers and Evanston Defendants. *Id.* Like in *Chicago Title*, the Evanston Defendants created the dispute by "assert[ing], and continu[ing] to assert," that they owed no duty to defend MGA. *Id.* If the Evanston Defendants were correct that they owed no duty to defend, the Umbrella Insurers owed a duty to defend. Thus, the Umbrella Insurers had a reasonable belief that they *might* be liable to MGA.[12] Because they had this

_____

[12] At oral argument, the Evanston Defendants stated that if the Umbrella Insurers had a reasonable belief that the Umbrella Insurers *owed* a duty to defend, then the Evanston Defendants had a reasonable belief that the Evanston Defendants did *not* owe a duty to defend. To the extent the Evanston Defendants argue that this Court's holding regarding the Umbrella Insurers' reasonable belief contradicts the Court's prior holding that the Evanston Defendants *do* owe a duty to defend, the Evanston Defendants are simply wrong on the law. The Umbrella Insurers' belief is reasonable not because of the *language* in Evanston's policy, but rather because Evanston *disputed* that the language in its policy made Evanston owe a duty to defend.

reasonable belief, they had an interest to protect.  Because they had an interest to protect, they did not act as volunteers by paying their insured and thus are not precluded from seeking equitable subrogation.

Well after the Umbrella Insurers defended the insured, this Court concluded that the Evanston Defendants *did* owe a duty to defend, and thus the Umbrella Insurers' were incorrect in believing that they owed a duty to defend.  However, the fact that the Umbrella Insurer's had a reasonable but *incorrect* belief that they owed a duty to defend does not preclude their recovery.  *See Home Ins. Co. v. Zurich Ins. Co.*, 96 Cal. App. 4th 17, 27, 116 Cal. Rptr. 2d 583, 591 (2002) ("[A]n insurer who pays a claim for which it is not legally responsible may be entitled to equitable subrogation."); *cf. Clarendon Am. Ins. Co. v. Mt. Hawley Ins. Co.*, 588 F. Supp. 2d 1101, 1106 (C.D. Cal. 2008) (noting, for purposes of equitable indemnity claim, that "the fact that [plaintiff insurer] may have provided payment while unsure of its obligation does not bar recovery once its obligation has been determined"); *State Farm Fire & Cas. Co. v. E. Bay Mun. Util. Dist.*, 53 Cal. App. 4th 769, 778-79, 62 Cal. Rptr. 2d 72, 77 (1997) (holding that plaintiff insurer that paid its insured when others refused to do so was not a volunteer *despite* "authority suggesting that [plaintiff insurer's] policy exclusions would have precluded coverage" because "the equities clearly favor" the plaintiff insurer where defendant was "waiting, reviewing, reestimating – and all the while the insureds [were] living with the loss" and "[t]o hold otherwise will only result in tardy satisfaction of legitimate claims and lead to more litigation as insurers are forced to justify their denial of coverage when defending bad faith claims").

In sum, the Umbrella Insurers acted not as volunteers, but rather to protect an interest, because they had a reasonable belief that they *might* owe a duty to defend MGA.  Their belief was reasonable because the Evanston Defendants disputed that they owed a duty to defend and, if the Evanston Defendants were correct, the Umbrella Insurers would owe a duty to defend MGA.  Because the Umbrella Defendants are not volunteers, they are not precluded from seeking equitable subrogation.

### iii.   The Evanston Defendants' Cases Are Inapposite Because They Involved Different Contract Language and A Different Cause of Action than Those in the Present Case

The Evanston Defendants argue that Chartis was a volunteer because the Chartis 2002 Policy did *not* create a duty to defend MGA *even if* the Evanston Defendants owed no duty to defend MGA.  The Evanston Defendants argue that Chartis owed no duty to defend because at least *one* of the primary insurers, Lexington, had agreed to defend MGA.  The Evanston Defendants rely on two California cases.  *See* Evanston Defs. Opp'n to National and Chartis' Summary J. (Dkt. 422) at 13-14 (citing *Padilla Const. Co., Inc. v. Transp. Ins. Co.*, 150 Cal. App. 4th 984 (2007) and *Republic W. Ins. Co. v. Fireman's Fund Ins. Co.*, 241 F. Supp. 2d 1090, 1094 (N.D. Cal. 2003)).  The Evanston Defendants' argument is a red herring because these two cases involve: (1) a different cause of action – an insurer's duty to defend – than the equitable subrogation cause of action at issue here; and (2) different contract language than the umbrella secondary insurance at issue here.

First, both *Padilla* and *Republic Western* were actions between an insured and its insurer in which the court held that the insurer owed no *duty to defend*; these cases say nothing about the cause of action here, which is an umbrella insurer's cause of action for equitable subrogation against a primary insurer.  *See Padilla*, 150 Cal. App. 4th at 988 (describing the issue before the court as "whether an excess insurer has a duty to 'drop down' and defend in an underlying action"); *Republic Western*, 241 F. Supp. 2d at 1092-93.  The test to determine whether a duty to defend exists is different than the test to determine whether an insurer is a volunteer for equitable subrogation.  The *duty to defend* exists where the allegations in the underlying complaint are "merely *potentially* covered, in light of facts *alleged* or otherwise disclosed" in the underlying suit.  *Buss*, 16 Cal. 4th at 46; *see also Pension Trust Fund for Operating Engineers v. Federal Ins. Co.*, 307 F.3d 944, 951 (9th Cir. 2002) ("California courts have repeatedly found that remote facts buried within causes of action that may potentially give rise to coverage are sufficient to invoke the defense duty.").  In contrast, an insurer is *not a volunteer for purposes of equitable subrogation* where the insurer has a "reasonable belief it *might*" owe a

duty to defend its insured, even if that belief is ultimately proven incorrect.  *See Fireman's Fund Ins. Co. v. Maryland Cas. Co.*, 21 Cal. App. 4th 1586, 1601 n.12, 26 Cal. Rptr. 2d 762, 771 n.12 (1994); *Home Ins. Co. v. Zurich Ins. Co.*, 96 Cal. App. 4th 17, 27, 116 Cal. Rptr. 2d 583, 591 (2002) ("[A]n insurer who pays a claim for which it is not legally responsible may be entitled to equitable subrogation.").  In short, a secondary insurer can have a *reasonable* belief that it might owe a duty to defend for purposes of equitable subrogation without having a *correct* belief that it owed a duty to defend.  Given the difference between the volunteer rule for purposes of equitable subrogation and the duty to defend, both *Padilla* and *Republic Western* are inapposite to the present case.

Furthermore, *Padilla* and the present case are different because the policy in the former used the word "and," whereas the latter uses the word "or" – a deceptively small distinction that is the bread and butter of lawyering.  In *Padilla*, the umbrella insurer's policy created a duty to defend only those claims "not covered by" *both* the scheduled underlying insurer "and" other "insurance available to the insured."  *Padilla Const. Co., Inc. v. Transp. Ins. Co.*, 150 Cal. App. 4th 984, 994, 58 Cal. Rptr. 3d 807, 815 (2007) (umbrella insurance clause created a duty to defend claims "not covered under . . . 'scheduled underlying insurance'; and . . . 'unscheduled underlying insurance,'" and defining "Unscheduled underlying insurance" as "insurance policies available to an insured, whether: . . . (1) primary; . . . (2) excess; . . . (3) excess-contingent; or . . . (4) otherwise").  In contrast, in the present case, Chartis's 2002 Policy created a duty to defend those claims "not covered by" *either* the scheduled underlying insurer "or any other underlying insurance providing coverage to the Insured."  *See* Parker Decl. Ex. A (Dkt. 346) at 7.  In sum, whereas the *Padilla* insurer's duty to defend existed only if *two* conditions were satisfied, the Chartis 2002 Policy's duty to defend existed if *either* one of two conditions were satisfied.[13]

---

[13] In addition, to the extent the Evanston Defendants argue that the policy in *Padilla* is the same as that in the National's 2001 Policy, the Evanston Defendants are wrong.  National's 2001 Policy created a duty to defend those claims "not covered by" the scheduled underlying insurance – with no "and" or "or" at all.  *See id.* Ex. B (Dkt. 346) at 42.  Thus, the National 2001

*Republic Western* is even farther afield from the policy language of the present case. *Republic Western* does not mention *what* conditions triggered the insurer's duty to defend, instead focusing on a part of the policy that stated "[w]e will consider the policy limits of liability as listed in the Primary Insurance Schedule to be available regardless of any defense which the insurer who provides the policy may assert because of your failure to comply with any condition of the policy, or the inability of the insurer to pay by reason of bankruptcy or insolvency." *Republic W. Ins. Co. v. Fireman's Fund Ins. Co.*, 241 F. Supp. 2d 1090, 1094 (N.D. Cal. 2003). Given that *Republic Western* does not discuss the part of the insurance contract specifying what triggered the duty to defend, that case offers no guidance to this court.

In sum, the Evanston Defendants' two cases do not persuade the Court to deviate from its conclusion that the Umbrella Insurers are not volunteers.

### h. Because the Umbrella Insurers Were Not Volunteers, They May Collect Their Total Loss From Evanston, But They Chose Not to Do So

#### i. The Umbrella Insurers' Total Loss is $12,608,278

As explained above and in the Prior Order, the Umbrella Insurers have satisfied all the elements of equitable subrogation. Because an insurer's duty to defend requires it to defend the *entire* action, that is, to pay for *all* the insured's defense fees and costs, Evanston was required to pay *all* the defense fees and costs of MGA. *See Buss v. Superior Court*, 16 Cal. 4th 35, 46, 49 (1997). Because the Umbrella Insurers stand in the shoes of their insured, MGA, they are entitled to collect *all* their defense fees and costs from Evanston.

The Umbrella Insurers' total loss is their payments for MGA's defense fees and costs minus any reimbursements they have received from other insurers for these fees and costs. As noted in the Prior Order, the Umbrella Insurers' payments for defense fees and costs totaled $18,906,029. Evanston reimbursed the Umbrella Insurers $689,477. C & F reimbursed the Umbrella Insurers $5,608,275.50. *See* Khetan Decl. Ex. 3 (Sealed Dkt. 638) at 5 (January 2012

---

Policy's duty to defend existed if *one* condition was satisfied, whereas the *Padilla* insurer's duty to defend existed only if *two* conditions were satisfied.

settlement between National and C & F).  Thus, **Umbrella Insurers' total loss is $12,608,278**. [$12,608,278 = $18,906,029 – $689,477 – $5,608,275.50].

> ### ii. However, the Court Reduces the Evanston Defendants' Liability at the Request of the Umbrella Insurers to Avoid Providing the Evanston Defendants With an Equitable Contribution Claim

At oral argument, however, the Umbrella Insurers explained that they wish to limit their recovery from the Evanston Defendants to avoid providing the Evanston Defendants with an equitable contribution claim against the other insurers with whom the Umbrella Insurers have settled.  Specifically, the Umbrella Insurers requested that the Court reduce the Umbrella Insurers' recovery so that the Evanston Defendants' **total liability** – for Lexington's equitable contribution plus the Umbrella Insurers' equitable subrogation claims – does **not exceed $10,919,015**.  *See* Response to 4/12/2012 Order (Dkt. 684) at 8 n.1 (explaining basis for $10,919, 015 calculation).  As the Court explained at oral argument, it is happy to reduce the Umbrella Insurer's recovery to at their request.[14]

Accordingly, although the Umbrella Insurers would be entitled to recover their entire loss from the Evanston Defendants, the Court limits the Umbrella Insurers' recovery at their request so that the Evanston Defendants' *total* liability does not exceed $10,919,015.  The Court deducts from $10,919,015 the amount that the Evanston Defendants are liable to Lexington, which is $1,492,267.  Thus, the Evanston Defendants' liability to the Umbrella Insurers for their equitable subrogation claim is $**9,426,748**. [= $10,919,015 – 1,492,267]

Accordingly, the Court ORDERS Evanston to pay the Umbrella Insurers **$9,426,748** for their equitable subrogation claim.

> ### i. The Court Reduces the Prejudgment Interest on the Evanston Defendants' Equitable Subrogation Liability from 10 to 7 percent

---

[14] The Court expresses no opinion as to whether this $10,919,015 number actually accomplishes the Umbrella Insurers' goal of eliminating an equitable contribution claim by the Evanston Defendants against the other insurers with whom the Umbrella Insurers have settled.

The Court's prior Order (Dkt. 521) imposed a 10 percent prejudgment interest on payments for both the equitable contribution and equitable subrogation claims.  The Evanston Defendants correctly note that the California Constitution states that "[i]n the absence of the setting of such rate by the Legislature, the rate of interest on any judgment rendered in any court of the state shall be 7 percent per annum."  Cal. Const. art. XV, § 1; *see* Evanston  Defs. Opp'n and Cross Motion (Dkt. 637) at 2.  However, the Evanston Defendants neglect to mention that liability for the breach of a "contract entered into after January 1, 1986," is subject to prejudgment interest at "10 percent per annum after a breach."  Cal. Civ. Code § 3289 (West).

Because the Umbrella Insurers' claims for equitable subrogation are based on Evanston's 2001 and 2002 Policies with MGA, those claims are based on contract and thus subject to 10 percent prejudgment interest.  *See Clarendon Nat. Ins. Co. v. Ins. Co. of W.*, CV F 99 5461 SMS, 2006 WL 2594452 at *3 (E.D. Cal. Sept. 11, 2006) (extensively analyzing the issue and holding that 10 percent statutory prejudgment interest applied to secondary insurer's equitable subrogation claim because such claims are based in insured's breach of contract claim against its primary insurer).  Thus, the Court does not change that the Prior Order regarding the Evanston Defendants' liability for 10 percent prejudgment interest on the Umbrella Insurers' equitable subrogation claim.

However, because Lexington's equitable contribution claim is based in equity, not on a breach of contract, the Court reduces the prejudgment interest on that claim to 7 percent.

Accordingly, the Court VACATES the prior Order (Dkt. 521) regarding the 10 percent prejudgment interest on Lexington's equitable contribution claim and REPLACES the interest rate with 7 percent.

### j.   Conclusion

In sum, the Court changes its Prior Order (Dkt. 521) to: (1) add an explanation as to why the pie is $38.9 million and not larger; (2) decrease the denominator from 9 to 7; (3) reduce the amounts Lexington and the Umbrella Insurers overpaid by the amounts they received in settlement with C & F; (4) add an explanation as to why the Evanston Defendants' have an equitable subrogation liability to Chartis; (5) increase the amount the Evanston Defendants owe

Chartis and National; and (5) reduce the prejudgment interest on the Evanston Defendants' equitable subrogation liability from 10 to 7 percent.

These holdings do not change the Court original holding that the Evanston Defendants are *liable* to Lexington under a theory of equitable contribution and to the Umbrella Insurers under a theory of equitable subrogation. However, these holdings do change the *amount* by which the Evanston Defendants are liable. The Court summarizes these changes as follows:

(1)    The Court ORDERS the Evanston Defendants to reimburse Lexington for the $1,492,267 that Lexington overpaid. The Court VACATES its previous holding that this amount was $4,444,444.44, which failed to account for Lexington's settlement with C & F.

(2)    The Court ORDERS the Evanston Defendants to pay the Umbrella Insurers $9,426,748 for their equitable subrogation claim. The Court VACATES its previous holding that this amount was only $4,048,122.66.

**III.    The Court Denies the Evanston Defendants' Motion to Amend Their Answer and Cross-Claims**

The Evanston Defendants have also moved for leave to amend their answer and cross-claims to add additional cross-claims for equitable contribution, equitable subrogation, and equitable indemnity against every insurer that is already a party to this action.[15] *See* Evanston Defs. Mot. Amended Answer and Cross-Claims (Dkt. 633); Khetan Decl. Ex. B (Dkt.635). The Court DENIES the Evanston Defendants' Motion.

**a.  The Court Denies As Futile the Evanston Defendants' Claims Against the Umbrella Insurers**

---

[15] The Evanston Defendants' failure to add Hartford reinforces the Court's belief that it would be inequitable to include Hartford in the denominator, as the Evanston Defendants appear to desire to "benefit financially in [Hartford's] absence." *See Scottsdale Ins. Co. v. Century Sur. Co.*, 182 Cal. App. 4th 1023, 1035, 105 Cal. Rptr. 3d 896, 905 (2010).

This Court has already held that the Umbrella Insurers owed no duty to defend because all the primary insurers who are a party to this action owed a duty to defend. *See* Order (Dkt 679). Because the Umbrella Insurers owed no duty to defend, the Evanston Defendants can not recover from the Umbrella Insurers under a theory of equitable contribution, equitable subrogation, or equitable indemnity. Accordingly, the Evanston Defendants' Motion is DENIED as to the Umbrella Insurers because it would be futile.

### b. The Court Denies For Lack of Good Cause the Evanston Defendants' Motion for Leave to Add Cross-Claims Against Other Primary Insurers

Where, as here, a court provided a "pretrial scheduling order that established a timetable for amending the pleadings" and that deadline has "expired," the ability to amend is evaluated under the stricter Federal Rule of Civil Procedure 16 rather than the more liberal Rule 15. *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1294 (9th Cir. 2000); *see also* Order (09-7461 Dkt 49) (setting September 13, 2010, deadline to amend the pleadings). Rule 16 requires a party to satisfy the requirements of Rule 15, as well as show "good cause" for its delay in seeking leave to amend. *See* Fed. R. Civ. P. 16(b)(4); *Coleman*, 232 F.3d at 1294.

To allow the Evanston Defendants to amend would allow a non-defending insurer to drag defending insurers through years of litigation regarding the former's refusal to defend and then to expose the defending insurers to new claims seven weeks before trial, all because the non-defending insurer finally chose to settle with its insured after denying a defense for over 20 months. Essentially, allowing the Evanston Defendants to amend punishes insurers who agreed to defend the insured and rewards the non-defending insurer for refusing to settle meritorious claims by its insured. That is not equity; it is extortion. It is also contrary to well-established precedent which holds that a district court may deny a motion to amend where, as here, discovery has closed and summary judgments motions have already been made. *See Matsumoto v. Republic Ins. Co.*, 792 F.2d 869, 872 (9th Cir. 1986) (denial of leave to amend was not abuse of discretion where "motion was made after discovery had commenced and at the same time [that movant's opponant] moved for summary judgment"); *Solomon v. N. Am. Life & Cas. Ins. Co.*, 151 F.3d 1132, 1139 (9th Cir. 1998) (denial of leave to amend was not abuse of discretion

where motion was made "on the eve of the discovery deadline" and thus amendment could cause "undue delay and prejudice").

Accordingly, the Court DENIES the Evanston Defendants' Motion of Leave to File Amended Answer and Cross-Claims (Dkt. 633).

**IV.    Disposition**

For the foregoing reasons, the Court DENIES the Evanston Defendants' Motion for Leave to File Amended Answer and Cross-Claims (Dkt. 633).

The Court GRANTS all parties' Motions for Relief from Judgment (Dkts. 590, 636) to the extent they ask the Court to reconsider its Prior Order (Dkt. 521). *See MGA Entm't, Inc. v. Hartford Ins. Group*, ED CV 08-0457-DOC, 2012 WL 628203, 2012 U.S. Dist. LEXIS 23998 (C.D. Cal. Feb. 24, 2012).

Regarding the specific relief sought by each party, the Court GRANTS the Lexington Defendants' Motion for Relief from Judgment (Dkt. 590), VACATES the Prior Order's holding on pages 17:13-18:3 that the denominator in this equitable contribution action is 9, and replaces it with the text in this order holding that the denominator is 7.

Regarding the specific relief sought by the Evanston Defendants' Motion for Relief from Judgment (Dkt. 636), the Court:

(1)    DENIES the Motion to the extent it seeks to increase the pie, but adds the explanation in this order as to why the pie is $38.9 million and not larger;

(2)    GRANTS the Motion to the extent it seeks to reduce the amounts Lexington and the Umbrella Insurers overpaid by the amounts they received in settlement with C & F;

(3)    DENIES the Evanston Defendants' request to eliminate their liability to Chartis, but adds the explanation in this order as to why the Evanston Defendants' have an equitable subrogration liability to Chartis;

(4)    INCREASES the amount the Evanston Defendants owe Chartis and National after reconsidering the Evanston Defendants' liability to these Umbrella Insurers;

(5)     GRANTS the request to reduce the prejudgment interest on the Evanston Defendants' equitable contribution liability from 10 to 7 percent, but DENIES the request regarding the Evanston Defendants' equitable subrogration liability.

These holdings do not change the Prior Order's ruling that the Evanston Defendants are liable to Lexington under a theory of equitable contribution and to the Umbrella Insurers under a theory of equitable subrogation.  However, these holdings do change the *amount* by which the Evanston Defendants are liable to the other insurers.  Thus, the Court ORDERS the Evanston Defendants to pay:

(3)     Lexington $1,492,267 for its equitable contribution claim.  The Court VACATES its previous holding that this amount was $4,444,444.44.

(4)     The Umbrella Insurers $9,426,748 for their equitable subrogation claim.  The Court VACATES its previous holding that this amount was only $4,048,122.66.

DATED: April 18, 2012

_David O. Carter_____

DAVID O. CARTER
UNITED STATES DISTRICT JUDGE